State of Maine                                    Superior Court
Kennebec, ss                                     Civil Action
                                                 Docket No.:


Mark Ardito,                          )
                                      )
            Plaintiff,                )
                                      )
v.                                    )
                                      )
Solvay S.A. and                      )
                                      )
Solvay Specialty Polymers            )
USA, LLC,                            )
                                      )
                                      )
            Defendants.               )


## Complaint and Demand for Jury Trial And Injunctive Relief Sought

Mark Ardito complains against Solvay S.A. and Solvay Specialty

Polymers USA, LLC (collectively "Solvay") as follows:


### Summary of Employment Whistleblower Retaliation Claims

1.     Ardito had an exemplary work record of over 15 years of

outstanding achievement and dedication to Solvay. But his employer chose to

exploit his strong track record and ability to generate customer trust to divert

trade secrets and confidential information from US customers to customers in

China including Huawei.

2.     Huawei is the world's largest telecommunications equipment

manufacturer and is strongly linked to the Chinese state and the Chinese Communist Party. In about January 2019, the United States announced criminal charges against Huawei regarding its "decades-long efforts . . .to misappropriate intellectual property, including from six US technology companies, in an effort to grow and operate Huawei's business."

3.     For over seven months, Solvay ignored Ardito's repeated internal whistleblowing reports and failed to even investigate his complaints. Despite his repeated requests for help, Solvay kept insisting that Ardito do his job in a manner that was violating legal obligations to US companies and betraying his country. Solvay's inaction in response to his urgent whistleblower reports eventually forced him to leave his job.

4.     After Ardito filed a protected whistleblower complaint with the Maine Human Rights Commission (MHRC), Solvay further retaliated against Ardito by making unlawful and burdensome demands directly on his adult daughter living in California and her then employer. Ardito's daughter's employer had no connection whatsoever with Ardito's employment for Solvay or his whistleblower reports. Solvay's unreasonable demands on Ardito's daughter were tools for harassment designed to punish and threaten him because of his whistleblower reports and complaint with the MHRC.

## The Parties

5.    Plaintiff Mark Ardito is a resident of Belgrade, County of Kennebec, Maine. Ardito has worked remotely from an authorized office at his home in Belgrade, Maine, throughout the course of his employment with Solvay.

6.    Solvay N.A. is one of the world's largest chemical and plastic companies. It stated in its 2019 Annual Report that it had "more than 24,100 employees in 64 countries" and it included as among its employees the employees of its wholly owned and controlled subsidiary Solvay Specialty Polymers USA, LLC (Solvay USA).

7.    Solvay N.A. also touted in its 2019 Annual Report its centralized oversight and supervision of human resource and labor relations policies and activities at its operations world-wide including at Solvay USA. For example, it stated, "In June 2019, we posted an e-learning session on WBAW [well-being at work], available to all employees in 15 languages, in order to ensure a uniform understanding and provide guidance. . . .In 2015, Solvay created a global employee representative body, the Solvay Global Forum, composed of eight employee representatives from the eight main countries where Solvay operates (**United States**, France, China, Brazil, Germany, Italy, India, and South Korea). . . . In February 2017 Solvay signed a Global agreement on a minimum level of welfare and healthcare protection for all Solvay Group

3

employees worldwide." Pages 145-46 (emphasis added)

https://www.solvay.com/sites/g/files/srpend221/files/2020-

05/en_short_corr_April_29.pdf.

8.   Defendant Solvay USA had over 500 employees for more than 20 weeks in 2018 and in 2019.

9.   Ardito was jointly employed by both Defendants, which are operated as an integrated, single enterprise.

## Jury Trial Demand

10.   Plaintiff demands trial by jury on all issues triable by a jury.

## Facts

11.   Ardito began working for Solvay in June 2003. As of 2016, Ardito served in the position of Sales Development Manager, in which he was responsible for the sale of high-performance plastics to customers in North America and was privy to highly confidential customer information. In 2016 Ardito was also given the responsibility of all of the US Electronics and Semiconductor business development accounts.

12.   Throughout his employment with Solvay Ardito performed his job duties extraordinarily well and received many highly favorable performance evaluations.

4

13.  Ardito's 2018 performance evaluation included the following comments:

- Mark has a strong work ethic and is willing to elevate to support Management roles;

- Mark applies advanced strategic approaches in negotiating, developing and closing sales;

- Mark has strong unique production and engineering experience consistent with our customers' perspective;.

- Mark quickly adapts to the business needs to deliver results.

- Mark applies experience to bring new ideas such as his idea to . . .

- Mark has a very high level of customer focus in all aspects, often advocating for customer needs;

- Mark is a self starter and is extremely opportunity focused;

- Mark is driven takes a high level of commitment and care to all aspects of his job in a self initiated way.

14.  Solvay's customers and potential customers provide it with highly confidential information based on Solvay's representations that this extremely valuable intellectual property will be kept safe by Solvay, used only to further that customer's interests, and certainly not to help a customer's competitors.

15.  Because the disclosure of confidential information by customers is an essential aspect of Solvay's customer relationships, Solvay enters into a nondisclosure agreement ("NDA") with its high-performance plastics customers in the United States.

16.  Solvay represents that the NDAs entered into are between the US customer and Solvay's US entity, Solvay Specialty Polymers USA, L.L.C.

17.  The NDAs prohibit the sharing of the US company's confidential information to Solvay employees and its affiliates who do not "need to know" the confidential information for the purpose of the NDA.

18.  Highly confidential client information (customer interactions, meeting reports, technical reports, sales, commercial and experimental product sample requests, contracts, and NDAs) is stored on Solvay's cloud based platform.

19.  Ardito's job duties frequently required him to organize technical meetings to discuss confidential projects and was instructed by management to document the confidential meetings in Solvay's cloud-based platform "Salesforce.com"

20.  In 2016, as part of the "Sky" reorganization project, Ardito was reassigned to the Electrical and Electronics (E&E) market with direct reporting to a Chinese citizen manager based at Solvay's affiliate located in China.

6

21.  The "Sky" reorganization promoted collaboration of the newly formed global market teams and provided Solvay's global Affiliates access to American customer confidential data stored in their cloud based customer database known as salesforce.com.

22.  Ardito was surprised by the reassignment because he had previously worked as the Global Market Manager for Paper and had very little E&E experience.

23.  Ardito was asked to move to the US West Coast where 80% of his high-tech customers were located. Ardito initially declined, but later informed his manager that he would consider a move as a concession to the company to save on travel expenses.

24.  To the best of Ardito's knowledge, he was the first American employee in the company to  report directly to a Chinese citizen manager and the first American to report to a manager based at Solvay's Affiliate located in China.

25.  In 2017, Ardito  became aware of Solvay breaches of confidentiality for its American customers through his reporting structure into China after discovering that his Chinese citizen manager failed to take action after one of her direct reports obtained highly confidential project information about one of his US clients through his internal reporting, and left Solvay to work for a direct competitor in Taiwan.

7

26. On May 2, 2018, Ardito contacted Solvay's legal team and Regional HR and asked for assistance in addressing the apparent breach of confidentiality and trade secret protections for his customer, and for help in appropriately reporting to a Chinese citizen manager while protecting American customers' confidential information.

27. Ardito explained to Solvay's Regional HR manager that based on his conversations and experiences with his Chinese citizen manager and Chinese citizen employees working at Solvay's Chinese affiliates that he was concerned about his customer's confidential information being shared outside of a "need to know" basis and used to benefit Chinese companies. Ardito also reported his concern about the high rate of turnover of Chinese employees potentially leaving Solvay and using his customers' confidential information for competitors of his customers.

28. Ardito asked for tools and for help to do his job in a legal and ethical manner protecting American customers' confidential information and trade secrets. The Regional HR Manager informed Ardito that Solvay had no policies or procedures to address his concerns. Ardito later confirmed that Solvay had no policy, procedures, or training for properly protecting customer confidential information.

8

29.  Ardito consulted his own outside council and conducted his own research on how to properly protect and control customer confidential information.

30.  Ardito informed the Regional HR Manager of his newly adopted practice of screening out American customer confidential information that he provided to his Chinese citizen Manager.

31.  The Regional HR Manager told Ardito that his manager would likely find out about his complaint. Ardito expressed his concern that offending his Chinese manager would hurt his standing and career at Solvay.

32.  The HR Manager expressed support  for the need for Ardito's screening practices and explained that she also needed to treat Chinese citizen employees differently and gave an example of not being able to hire a Chinese citizen. But she  provided no assistance or guidance to Ardito about how to handle his own reporting issues or how to explain the screening practice to his  Chinese citizen manager. Ardito was concerned about retaliation by his manager.

33.  Ardito continued his practices of screening out American customer confidential information that he provided to Solvay's Chinese affiliates (including Ardito's Chinese Manager) based on a "need to know" basis defined in his US customer's NDA's until he was instructed to discontinue this practice by both his Chinese citizen manager and Solvay's

9

Business Director. On about September 27, 2018, they told Ardito "Bottom line, it's not your decision to decide what to inform your manager or not" thereby creating an automatic "need to know" funneling of American customer's confidential information directly to Solvay's Chinese affiliate.

34.   Ardito obeyed the orders of Solvay's Business Director and began to provide American customer confidential information to his Chinese citizen manager based at Solvay's Chinese affiliate.

35.   A short time later, Ardito noticed specific incidents when Solvay's Chinese citizen employees based at Solvay's Chinese Affiliate, including his Chinese citizen manager, violated nondisclosure agreements with Solvay customers in the United States by using their confidential information to further the interests of Solvay's customer Huawei.

36.   Ardito also reported his concerns—about unlawful breaches of the confidentiality of the intellectual property of US companies— in writing, including on October 10, 16, and 17, 2018, November 9, 2018 and December 4, 2018, and directly to his HR and senior management, that his Chinese citizen manager was funneling confidential, and potentially trade secret information from his customers in the United States to be used for the benefit of one of their major competitors, Huawei, a company controlled by the government of China.

37.  Ardito provided the specific American customer NDA details to the Solvay Business manager on October 12th, 2018. Ardito did this in an effort to stop the ongoing unlawful conversion of American customer confidential information to benefit Huawei.

38.  Solvay's Business Manager failed to call for an investigation, but instead simply asked Ardito's Chinese citizen Manager and another employee (not involved in the breach) of any wrongdoing and reported back "This is not an issue."

39.  Solvay's Business Manager took no further action to investigate the violation, but instead instructed Ardito to work on his own improving his communication of his American customer's information directly to his Chinese citizen manager.

40.  Ardito also specifically reported concerns to Solvay's management about the access Chinese citizens had to confidential US government and military applications stored on the company's Salesforce.com platform[1]. Salesforce.com is a cloud computing service that allows businesses to use cloud technology to better connect with customers, partners, and potential customers.

41.  Ardito was specifically given Delegation of Authority by

---

[1] Whistleblower training of Solvay's employees is mandated by some client contracts. Ardito was never provided with this training.

Solvay to sign Solvay's government contract with the US in 2015. The government contract required that Solvay provided its employees with whistleblower training. Ardito never received any whistleblower training from Solvay.

42.  Ardito attended a training by Solvay in July 2018 regarding protecting the confidentiality of intellectual property. This training was conducted by the Intellectual Assets Management (IAM) group of lawyers at Solvay.

43.  At the end of this training in July 2018, Ardito provided written comments to IAM explaining his concerns about the access Chinese Nationals had to confidential US government and military applications stored on the company's Salesforce.com platform.

44.  On December 14, 2018, Ardito was contacted by a Solvay attorney from IAM about his July 2018 written comments about Salesforce.com. During this phone call, Ardito described in detail his concerns. He specifically used a military application as an example and identified his Chinese manager as having unfettered access to all of his postings on Salesforce.com with confidential information about all of his customers.

45.  The Solvay attorney repeatedly stated during the call that his

12

concerns were 100% correct and that Solvay had "missed completely" this hole in its confidentiality protections, including saying that "we had no idea about this and how salesforce works." The attorney repeatedly promised Ardito during the phone call that he would send him the written materials from the July 2018 training on confidentiality, but he never did.

46.   For over seven months from May 2018 to December 2018, Ardito diligently and loyally made internal whistleblowing reports to Solvay about its unlawful transfer of the confidential intellectual property of US customers to their Chinese competitors, but no corrective actions were taken by Solvay.

47.   Solvay made it impossible for Ardito to do his job without violating the law. Ardito could not in good conscience continue to perform his job for Solvay, knowing that it had structured his job duties as part of a scheme to violate the confidentiality rights of the US government and US customers and thereby susceptible to improper use by the Chinese government and Chinese customers.

48.   Due to the intolerable hostile working conditions and the mental anguish and stress caused by Solvay's failure to respond for over seven months to his whistleblowing reports, Ardito required medical leave and had no other reasonable option but to leave his position with Solvay, as it was then structured, on December 10, 2018.

49.  Ardito has learned from his co-workers that on about July 3, 2019 Solvay's HR announced that Ardito was no longer with the company. (Solvay also completely stopped paying Ardito at the same time.) Ardito contacted the Solvay Benefits Center and confirmed he was no longer employed by Solvay and was given former employee benefit instructions including assistance in completing the transfer of his 401k retirement account from Solvay's retirement plan to an IRA.

50.  Ardito was eventually able to return to a dramatically different job with significantly less responsibilities and opportunities for advancement.

51.  Solvay recognized that there were no policies or procedures in place regarding customer confidential information management and offered Ardito to be part of a Steering Committee to address these issues.

52.  The Steering Committee failed to reach its objectives in 2019 or 2020. No Output has been produced by the Steering Committee, except for asking for another department to do the work the committee was assigned to.

53.  The Steering Committee turned out to be a sham, accomplishing nothing, meeting on only three occasions since their kick-off meeting on October 18th of 2019. Meanwhile, other Solvay teams worked quietly to cover up the many gaps in customer confidential information management Ardito had uncovered.

54.  Ardito was not treated as an equal to the other Steering Committee members. He was the only one who was forced to furlough for four weeks during COVID-19 and was not allowed to participate in Steering Committee assigned teams to implement corrections to the many problems. Ardito was the only member who was not a Vice President level Solvay employee.

55.  Regardless of the Steering Committee's efforts to block Ardito from making contributions, Ardito was determined to do everything he could to prevent Solvay from continuing to expose its American customers to potential trade secret theft and to continue to use its employees as conduits for  illegal activities and breaches of customer's contractual confidentiality obligations.

56.  Ardito created his own 25-slide, 90-minute Power Point presentation as a proposed action plan to help correct Solvay's failure to protect customer confidential information and presented it to Solvay's top management on March 30, 2020, August 31, 2020 and on February 4, 5 and 8, 2021.

57.  Solvay has implemented and continues to pull pieces from Ardito's proposed corrective action plan with no acknowledgment of his work or contributions in an effort to whitewash the corrective actions as their own. Solvay has repeatedly denied Ardito's many offers to participate in the

15

writing of new policy for protecting confidential customer information and the training of employees about this policy. Ardito has reported his concerns to the Steering Committee about their failure to produce any results after 15 months and for not making it a priority to correct Solvay's ongoing failure to protect confidential customer information.

58.   On December 5, 2018, Solvay's Chief Litigation & Employment Department finally contacted Ardito for the first time about his whistleblowing reports, which dated back to May 2, 2018.

59.   In his email communications, Solvay's Attorney stated that he was taking "with the utmost seriousness" the "allegations and issues raised in" Ardito's communications and that "it is critical that the Company **commence a thorough internal investigation** into this matter." Emphasis added.

60.   Solvay's Attorney also told Ardito that the "investigation should commence with your interview."

61.   This December 5, 2018 email from Solvay's attorney is an admission that Solvay delayed for seven months after Ardito's first whistleblower report on May 2, 2018 before it even began to investigate his whistleblower reports.

62.   Solvay's investigation by this attorney was not only way too late

but it also turned out to be a sham designed to whitewash the illegal actions

taken by Solvay to misuse the intellectual property of its US customers for

the benefit of its Chinese customers.

63. In this purported investigation for Solvay, its attorney

intentionally downplayed or completely ignored Ardito's whistleblower

reports.

64. In a May 15, 2019 letter to Ardito, an attorney for Solvay

falsely complained that Ardito had never reported his concerns related to

Salesforce.com.

65. Solvay did not take Ardito's whistleblower reports seriously

and failed to investigate properly or to take appropriate corrective action on

his reports of the company's unlawful practices with their clients' intellectual

property, particularly the direct access Chinese nationals had to US military

information.

66. On March 3, 2020, Solvay retaliated against Ardito by

making unlawful and retaliatory demands directly on his adult daughter

living in California and her then employer. Solvay's lawyers on March 3,

2020, mailed three-page, single-spaced, demand letters to both Ardito's adult

daughter, and her direct supervisor at her then place of employment.

67. These communications by Solvay were made without Ardito's

17

knowledge and disclosed highly sensitive and private information about Ardito that he had not discussed with his daughter or her employer relating to his employment with Solvay. For example, these communications stated that Ardito (1) has a major "ongoing dispute" with his employer Solvay, which led Solvay to retain outside legal counsel to represent it; (2) has "made or filed" "internal complaints" with Solvay; and (3) has claimed an "allegedly ruined career at" Solvay.

68.   Solvay's lawyers' March 3, 2020 communications with Ardito's daughter and her then employer demanded that they preserve "All documents pertaining to Ardito's activities, whereabouts, lifestyle, [and] living conditions" from January 1, 2017, onward and falsely advised them that they "have an obligation to maintain all documents that relate to the categories identified above in any way that are in your possession, custody, or control, whether located in your home, office, computer, cell phone, car, tablet, or elsewhere, concerning any of these subjects."

69.   Solvay's lawyers' March 3, 2020 communications with Ardito's daughter and her then employer also unreasonably demanded in bold that they respond to the three-page demand by Friday, March 13, 2020, which was only ten days from the date of the demand letter sent by US mail.

70.   Ardito engaged in protected conduct under the False Claims

18

Act and MWPA by taking actions in furtherance of a False Claims Act action and making other efforts to stop one or more violations of the False Claims Act.

71.  Solvay acted with malice or reckless indifference to Plaintiff's rights under the MWPA and the MHRA.

## Exhaustion of Administrative Procedures

72.  On September 4, 2019, Ardito filed a complaint of unlawful whistleblower retaliation in employment against Solvay with the Maine Human Rights Commission ("MHRC").

73.  On November 18, 2020, Ardito received a Notice of Right to Sue from the MHRC.

74.  Under 5 M.R.S. §4622, Ardito has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

75.  Ardito has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Legal Claims

### (Whistleblower Retaliation Claims for Retaliatory Hostile Work Environment and Constructive Discharge)

76.  The allegations in paragraphs 1-74 are realleged.

77.  In violation of the anti-retaliation provision of the False Claims Act (FCA), 31 U.S.C. § 3730(h), the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S. §§ 831-840, and the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551-4634, Solvay intentionally retaliated against Ardito including by creating a hostile work environment for him, constructively discharging him on December 10, 2018, from his full-time position, and through other acts of retaliation including making unlawful and retaliatory demands directly on his adult daughter and her employer.

78.  Due to the intolerable hostile working conditions and the mental anguish and stress that he was subjected to, Ardito had no other reasonable option but to leave his position with Solvay, as it was then structured, on December 10, 2018. Thus, he was constructively discharged from his full-time position as of December 10, 2018. *See, e. g., Labarbera-Haines v. Boardwalk Invs.*, LLC, 2007 Wise. App. LEXIS 45 (Ct. App. Wise. Dist. 4 2007) (upholding constructive discharge claim when employer repeatedly requested that employee participate in illegal conduct in the course of their employment, and employee resigned as a result); *Smith v. Brown-Forman Distillers Corp.*, 196 Cal.App.3d 503 (2nd Dist. Ct. App. Cal. 1987) (upholding jury verdict in favor of plaintiff, including trial court's jury instruction that

"[requiring] an employee to violate the law as a condition of employment
constitutes a constructive discharge").

79.  Solvay's failure to promptly investigate Ardito's
whistleblower reports and complaints makes it liable to Ardito under the
FCA, MWPA and MHRA. *See, e. g., Cerros v. Steel Techs., Inc.*, 398 F.3d 944,
954 (7th Cir. 2005) ("Our cases recognize prompt investigation of the alleged
misconduct as a hallmark of reasonable corrective action. "); *Daniels v. Essex
Grp., Inc.*, 937 F.2d 1264, 1275 (7th Cir. 1991) (finding employer liable for
hostile work environment because it was "less than diligent in taking
remedial action").

80.  Solvay interfered with Ardito's exercise and enjoyment of the
rights granted and protected by the MHRA and otherwise violated the
prohibitions in 5 M.R.S.A. § 4633.

81.  As a direct and proximate result of Defendant's intentional
retaliation against Plaintiff, he has suffered and will continue to
suffer damages, including, but not limited to lost wages and benefits, loss of
self-confidence and purpose, emotional distress, humiliation and
embarrassment, financial distress, emotional pain and distress, suffering,
inconvenience, mental anguish, loss of enjoyment of life, injury to reputation,
injury to career, deprivation of professional and career opportunities, and

21

other pecuniary and non-pecuniary losses. and other pecuniary and non-pecuniary losses.

82.  Ardito is pursuing all possible methods of proving this retaliation, including but not limited to circumstantial and direct evidence, pretext evidence, causation based on a single unlawful motive, and causation based on mixed motives including an unlawful motive.

83.  Plaintiff requests relief against Solvay as follows:

a.  Enter Judgment in Plaintiff's favor;

b.  Enter declaratory relief that Solvay violated Plaintiff's statutory civil rights to be free from unlawful retaliation;

c.  Enjoin Solvay, its agents, successors, employees, and those acting in concert with Solvay from continuing to violate Plaintiffs' rights;

d.  Enter injunctive relief ordering Solvay to:

- Provide effective civil rights training for all human resources employees and all supervisors on the requirements of all applicable laws prohibiting retaliation and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

- Provide this training for two years after the date judgment is entered to all new human resources and supervisory employees within 60 days of their starting the position;

- Maintain attendance sheets identifying each person who

22

attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

         o        Post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief.

e. Order Solvay to reinstate Plaintiff to his position as if the retaliation had not occurred or, in lieu of employment if such employment is determined to be impracticable, order front pay for future lost wages and benefits;

f. Award Plaintiff back pay, lost employment benefits, other lost compensation, and interest on those amounts;

g. Award Plaintiff compensatory damages in an amount to be determined at trial in this action;

h. Award Plaintiff special damages under 31 U.S. § 3730(h)(2);

i. Award Plaintiff two times the amount of back pay and interest on the back pay under the False Claims Act, 31 U.S. § 3730(h)(2);

j. Award Plaintiff an amount to offset the state and federal taxes he will be required to pay for compensatory damages and any increased taxes he will have to pay because he has received a lump sum for lost wages, employment benefits, or other lost compensation;

k. Award Plaintiff nominal damages;

l.   Award Plaintiff full costs and reasonable attorney's fees, including legal expenses, expert witness fees, and costs of suit;

m. Award Plaintiff prejudgment interest; and

n.   Award Plaintiff such other and further relief as may be just and proper.

Date: February 16, 2021          Respectfully submitted,

David G. Webbert, Esq., Bar No. 7334
Johnson, Webbert & Garvan, LLP
160 Capitol Street, Suite 3
Augusta, ME  04332-0079
Tel:  (207) 623-5110

24