UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MARK ARDITO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-cv-00142-JAW |
| | ) | |
| SOLVAY, S.A., and SOLVAY | ) | |
| SPECIALTY POLYMERS USA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PENDING MOTIONS**

An employer-defendant brings a motion to dismiss an employee-plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The employee alleges that the employer violated the Maine Human Rights Act and Maine Whistleblowers' Protection Act by creating a retaliatory hostile work environment. The Court concludes that the plaintiff has properly stated a claim on which relief can be granted.

## I.   PROCEDURAL HISTORY

On February 17, 2021, Mark Ardito filed a complaint in Kennebec County Superior Court in the state of Maine against Solvay S.A. (Solvay) and Solvay Specialty Polymers USA, LLC (SSP) alleging violations of the False Claims Act, Maine Whistleblowers' Protection Act, and the Maine Human Rights Act. *Def.'s Notice of Removal* (ECF No. 1) (*Notice of Removal*), Attach. 1, *Compl. and Demand for Jury Trial and Injunctive Relief Sought*. On June 1, 2021, Solvay and SSP filed a notice removing the case from state to federal court. *Notice of Removal* at 1-6.

On June 8, 2021, Solvay and SSP filed separate motions to dismiss. *Mot. to Dismiss of Def. Solvay Specialty Polymers USA, LLC* (ECF No. 9); *Mot. to Dismiss of Def. Solvay S.A.* (ECF No. 11). On September 7, 2021, Mr. Ardito filed a motion for leave to file an amended complaint in lieu of an opposition to SSP's pending motion to dismiss. *Pl.'s Mot. for Leave to File Am. Compl.* at 1 (ECF No. 19). In that motion he conceded that the Court does not have personal jurisdiction over Solvay. *Id.* On September 27, 2021, the Court granted Mr. Ardito leave to file an amended complaint, dismissed as moot and without prejudice SSP's motion to dismiss, and dismissed without prejudice all claims against Solvay. *Order* at 1 (ECF No. 23). SSP remains the only defendant.

On September 29, 2021, Mr. Ardito filed his First Amended Complaint alleging violations of the Maine Whistleblowers' Protection Act and the Maine Human Rights Act. *First Am. Compl. and Demand for Jury Trial and Injunctive Relief Sought* (ECF No. 24) (*First Am. Compl.*). The First Amended Complaint is now the operative complaint.

On October 14, 2021, SSP filed a new motion to dismiss. *Mot. to Dismiss of Def. Solvay Specialty Polymers USA, LLC* (ECF No. 25) (*Def.'s Mot.*). On October 28, 2021, Mr. Ardito responded in opposition to SSP's motion to dismiss. *Pl.'s Opp'n to Def.'s Mot. to Dismiss First Am. Compl.* (ECF No. 26) (*Pl.'s Opp'n*). On November 4, 2021, SSP replied. *Def.'s Reply in Supp. of its Mot. to Dismiss Pl.'s First Am. Compl.* (ECF No. 27) (*Def.'s Reply*).

On March 5, 2022, Mr. Ardito filed a praecipe in support of his opposition to SSP's motion to dismiss, requesting that the Court take judicial notice of an attached Right-to-Sue letter from the Maine Human Rights Commission dated March 1, 2022. *Pl.'s Praecipe in Supp. of His Opp'n to Def.'s Mot. to Dismiss First Am. Compl. Pertaining to Maine Human Rights Commission Right-to-Sue Letter* (ECF No. 31) (*Pl.'s Praecipe*).   On March 21, 2022, SSP objected to Mr. Ardito's praecipe.   *Def. Solvay Specialty Polymers USA, LLC's Resp. to Pl.'s Praecipe in Supp. of His Opp'n to Def.'s Mot. to Dismiss First Am. Compl.* (ECF No. 32) (*Def.'s Opp'n to Praecipe*). Finally, on March 23, 2022, Mr. Ardito responded to SSP's objection to his praecipe. *Pl.'s Reply to Def.'s Resp. to His Praecip in Supp. of His Opp'n to Def.'s Mot. to Dismiss First Am. Compl.* (ECF No. 33) (*Pl.'s Reply to Def.'s Opp'n to Praecipe*).

## II.   FACTS[1]

In June 2003 Mr. Ardito began working for SSP, a subsidiary of Solvay S.A., one of the world's largest chemical and plastics companies.[2]   *First Am. Compl.* ¶¶ 13-14.   By 2016 Mr. Ardito was a Sales Development Manager responsible for the sale of high-performance plastics to public and private customers in North America.   *Id.* ¶ 13.   Throughout his employment at SSP, Mr. Ardito performed well and received favorable performance evaluations, including commendations for his strong work

---

[1]   Consistent with Federal Rule of Civil Procedure 12(b)(6), in describing the facts, the Court has relied upon the allegations in the Plaintiffs' First Amended Complaint.   *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68 (1st Cir. 2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) ("We examine whether the operative complaint states a claim for which relief can be granted when we construe the well-pleaded facts in the light most favorable to the plaintiffs, accepting their truth and drawing all reasonable inferences in plaintiffs' favor" (internal citation omitted)).

[2]   The Plaintiff refers to the Defendant as "Solvay" and the Defendant refers to itself as "SSP." The Court uses the Defendant's preferred terminology.

ethic, ability to negotiate and close sales, customer service, and his adaptability, drive, and commitment. *Id.* ¶¶ 15-16.

In his position, Mr. Ardito was privy to highly confidential customer information and trade secrets. *Id.* ¶ 13. Customers and potential customers regularly provide SSP with confidential information about valuable intellectual property so that SSP can further their unique interests. *Id.* ¶ 17. As a result, SSP enters into non-disclosure agreements (NDAs) with its high-performance plastics customers in the United States to protect the customers' confidential information and trade secrets. *Id.* ¶ 18. Specifically, the NDAs prohibit SSP from sharing confidential information and trade secrets with its employees and affiliates who do not "need to know" that information. *Id.* ¶ 20. SSP stores confidential client information on the cloud-based platform, "Salesforce.com" (Salesforce), a computing service that allows businesses to connect with customers. *Id.* ¶¶ 21-22. Mr. Ardito's job frequently required him to organize meetings to discuss confidential projects and SSP management instructed him to document confidential meetings on Salesforce. *Id.* ¶ 22.

## A. SSP's 2016 Reorganization

In 2016, as part of its "Sky" reorganization project, SSP reassigned Mr. Ardito to the "Electrical and Electronics" (E&E) market, reporting directly to Global Business Development Manager, Ron Chan, a Chinese national based out of SSP's Chinese affiliate. *Id.* ¶ 23. The Sky reorganization promoted collaboration among newly formed global market teams and provided SSP's global affiliates access to U.S. customers' confidential and trade secret data stored on Salesforce. *Id.* ¶ 24. To Mr.

Ardito's knowledge, he was the first American employee in SSP's Global Business Unit (GBU) to report directly to a Chinese citizen manager and the first American to report to a manager based at SSP's Chinese affiliate. *Id.* ¶ 25. As part of the reorganization, SSP gave Mr. Ardito responsibility over U.S. Electronics and Semiconductor business development accounts, which included high-tech customers and amounted to over thirteen new accounts. *Id.* ¶ 26.

In May 2017 Mr. Chan offered Mr. Ardito an opportunity to move to the west coast to be closer to his customers, 80% of whom were located there. *Id.* ¶ 27. Mr. Ardito declined the offer, but SSP assured him that when it hired a new west coast sales representative, Mr. Ardito would have management and oversight over that person remotely from Maine. *Id.* This would be a promotional opportunity considering Mr. Ardito's well-documented career development plan at SSP. *Id.* Mr. Ardito's performance records and evaluations reflect his career plan to work towards an Area Development Manager position at SSP, a higher-level position than he occupied at the time. *Id.* ¶ 29. The number and nature of Mr. Ardito's high-profile customers were, and are, directly related to his ability and/or opportunity to be promoted to a management level position at SSP. *Id.* ¶ 28.

In September 2017 Vivian Tong, also a Chinese national, replaced Mr. Chan as Mr. Ardito's immediate manager. *Id.* ¶ 30. Ms. Tong moved forward with hiring a sales representative on the west coast. *Id.* ¶ 31. Mr. Ardito expressed his willingness to relocate and be reassigned and/or apply for the position given his experience at SSP and relationships with SSP's west coast customers. *Id.* Ms. Tong

5

informed Mr. Ardito that he would be considered for the position or would have oversight over the new hire given his years of experience at SSP. *Id.* However, SSP never interviewed or contacted Mr. Ardito to discuss the position. *Id.* ¶ 32.

## B. Mark Ardito Raises Concerns About SSP's Usage of Client Information

In the fall of 2017, Mr. Ardito became aware of potential breaches of U.S. customers' confidential and trade secret information. *Id.* ¶ 33. Mr. Ardito discovered that Ms. Tong's other direct reports were interested in sharing a confidential technical breakthrough Mr. Ardito developed with a leading U.S. semiconductor client with other prospective SSP customers competing in the same market. *Id.* The potential market revenue for SSP as a result of this new application was worth in excess of $90 million per year globally. *Id.* Ms. Tong, who was responsible for approximately $100 million in sales growth per year, was also responsible for driving SSP's polymer sales globally for her team, and Mr. Ardito became concerned that Ms. Tong and her direct reports were misusing confidential information in violation of customers' NDAs. *Id.* ¶¶ 33-34.

On December 15, 2017, after not hearing from Ms. Tong about reassignment to the vacant west coast position, Mr. Ardito contacted SSP's Chief Executive Officer, Mike Finelli, regarding the position but did not receive a response. *Id.* ¶ 35. In January 2018, SSP hired Patrick West as the west coast Sales Development Manager. *Id.* at 36. Mr. Ardito thereafter began transferring accounts to Mr. West with the understanding that he would have oversight over Mr. West as the new Area

6

Development Manager; however, Mr. Ardito's managerial oversight role never materialized. *Id.* ¶ 37.

That same month, Mr. Ardito notified Ms. Tong that he was concerned that SSP was misappropriating confidential customer information by disclosing an American customer's information to its competitors to increase product sales. *Id.* ¶ 38. Ms. Tong disagreed with Mr. Ardito and supported the spread of customers' confidential information to competitors to increase SSP's polymer sales. *Id.* Mr. Ardito appealed Ms. Tong's decision to Wolf Sanner, another SSP manager, who overrode Ms. Tong's position and decision. *Id.* ¶ 39.

From this point forward, Ms. Tong no longer supported Mr. Ardito's promotion to Area Development Manager or his oversight over Mr. West. *Id.* ¶ 40. Around this same time, Ms. Tong began stripping Mr. Ardito of his clients and reassigning them to Mr. West. *Id.* ¶ 41. Of the approximately thirteen customer accounts Mr. Ardito handled before disclosing his concerns about the misappropriation of customer information, Ms. Tong reassigned nine accounts to Mr. West without Mr. Ardito's involvement or oversight. *Id.* ¶ 42. Ms. Tong instead assigned Mr. Ardito to handle exploratory accounts for an experimental SSP product, which had little potential for bonus compensation, was less high-profile in the plastics industry, and would not serve as a vehicle for promotions in the future. *Id.* ¶ 43.

### C.  Mark Ardito Escalates Disclosures of Concerns About Client Information Misappropriation

On May 2, 2018, Mr. Ardito contacted SSP legal team member, Wendy Ho, to ask for assistance in addressing the confidentiality breach, protecting trade secrets

of his other customers, and navigating how to report Ms. Tong. *Id.* ¶ 44. Ms. Ho referred Mr. Ardito to Angela Reganall, SSP's Regional Human Resources (HR) Manager. *Id.* ¶ 45. Mr. Ardito also consulted his own outside legal counsel and conducted his own research on how to protect and control confidential customer information and trade secrets. *Id.* ¶ 52.

Mr. Ardito contacted Ms. Reganall and explained his concerns about the misappropriation of American customers' confidential and trade secret information to benefit Solvay, S.A., SSP's Chinese affiliate, and its Chinese customers. *Id.* ¶ 46. Mr. Ardito also expressed his concern about the high rate of turnover of Chinese employees leaving SSP to join Chinese competitors, potentially using his customers' confidential and trade secret information. *Id.* ¶ 47. Mr. Ardito asked Ms. Reganall for tools to help him do his job in a legal and ethical manner, while protecting his customers' confidential information and trade secrets. *Id.* ¶ 48. Ms. Reganall informed Mr. Ardito that SSP had no policies or procedures to address protecting customers' confidential information and trade secrets. *Id.* ¶¶ 48-49.

Mr. Ardito also told Ms. Reganall of his newly adopted practice of screening confidential U.S. customer information from Ms. Tong in an effort to protect his U.S. customers pursuant to his NDA obligations, and to protect himself from legal exposure resulting from any trade secret misappropriations. *Id.* ¶ 53. Ms. Reganall informed Mr. Ardito that Ms. Tong would likely find out about his "whistleblower" complaint. *Id.* ¶ 54. In response, Mr. Ardito expressed concern that offending Ms. Tong would damage his standing and career at SSP. *Id.* Ms. Reganall expressed

support for his screening practices and agreed that SSP needed to treat Chinese citizen employees differently. *Id.* ¶ 55. However, Ms. Reganall did not offer Mr. Ardito guidance or assistance on how to handle his reporting issue or how to explain his screening practice to Ms. Tong. *Id.* Mr. Ardito was concerned that Ms. Reganall's failure to provide concrete action items to address his concern would lead to further retaliation from Ms. Tong. *Id.* ¶ 56. Over the next few months Mr. Ardito continued to screen American customers' confidential and trade secret information on Salesforce and provided Ms. Tong and other SSP Chinese affiliates confidential information on a "need to know" basis. *Id.* ¶ 57.

Around the same time that Mr. Ardito disclosed his concerns to Ms. Reganall, Ms. Tong began restricting Mr. Ardito's travel by limiting him to the United States. *Id.* ¶ 50. During this time, Mr. Ardito was working on the final stages of a high priority SSP project and needed to travel to Asia to support the final production stages for the customer's product; however, Ms. Tong prevented Mr. Ardito from working with the client overseas. *Id.* At the same time, Ms. Tong permitted the new hire, Mr. West, to travel globally for lower priority projects. *Id.* ¶ 51.

### D. SSP Orders Mark Ardito to Cease Screening American Clients' Confidential Information

From May to September 2018, SSP repeatedly ordered Mr. Ardito to share confidential and trade secret information with Ms. Tong. *Id.* ¶ 60. Twice in September 2018, Ms. Tong confronted Mr. Ardito and ordered him to stop screening his customers' information on Salesforce, in one instance berating him to end his screening procedures. *Id.* ¶¶ 58-59. Mr. Ardito alleges that Ms. Tong's demand was

effectively an order for him to violate SSP customers' NDAs and U.S. law. *Id.* ¶ 59. During this time all discussions of a promotion to Area Development Manager with associated oversight over the new west coast sales hire ceased, Mr. Ardito's customer base dwindled, and his job responsibilities substantially changed, negatively impacting his bonus potential and promotability. *Id.* ¶¶ 60-61.

Feeling helpless, Mr. Ardito contacted Tom Wood, SSP's Business Director, on September 27, 2018, and explained that he was trying to protect SSP and himself from liability. *Id.* ¶ 63. Mr. Wood responded that "[b]ottom line, it's not your decision to decide what to inform your manager or not." *Id.* ¶ 64. To Mr. Ardito, Mr. Wood's statement made clear SSP senior management's authorization to funnel American customers' confidential and trade secret information directly to SSP's Chinese affiliate. *Id.* Mr. Ardito alleges that he reasonably believed that SSP's directives violated state and federal law but felt compelled to obey Mr. Wood's orders out of fear of losing his job. *Id.* ¶ 65. Mr. Ardito thereafter acquiesced and allowed Ms. Tong unfettered access to confidential information on Salesforce. *Id.* ¶ 66. Mr. Ardito says that due to his managers' unlawful orders and the knowledge that he was involved in the potential misappropriation of confidential and trade secret information in violation of state and federal law he reported to work each day with increasing stress resulting in physical symptoms. *Id.* ¶ 67.

### E. Mark Ardito Discovers Repeated Misappropriation of Trade Secrets

Shortly after Mr. Wood and Ms. Tong ordered Mr. Ardito to openly share confidential and trade secret information, Mr. Ardito discovered specific incidents of

Chinese citizens located at SSP's Chinese affiliate knowingly violating United States customers' NDAs by using their confidential and trade secret information to further the interests of their Chinese customers.  *Id.* ¶ 68.  Mr. Ardito alleges that the underlying motivation was the financial benefit to SSP's Chinese affiliate from increased plastics business in China.  *Id.*

Mr. Ardito immediately reported his concerns about unlawful confidentiality breaches, in writing, to Ms. Reganall, Mr. Wood, and SSP Global Security Officer Satchit Srinivasan, on or about October 10, 16, and 17, November 9, and December 4 in 2018.  *Id.* ¶ 69.  Specifically, Mr. Ardito reported that Ms. Tong and her subordinates in China were funneling confidential information from a U.S. customer to benefit a major competitor in China, a company Mr. Ardito understood to be controlled by the Chinese government.  *Id.*  On October 12, 2018, Mr. Ardito provided Mr. Wood with the specifics of the U.S. customer's NDA.  *Id.* ¶ 70.  Mr. Wood reported back to Mr. Ardito that he asked Ms. Tong and another employee if any wrongdoing had occurred and concluded: "This is not an issue."  *Id.* ¶ 71.  However, neither Mr. Wood, nor any other SSP management official or compliance employee, called for investigation into Mr. Ardito's allegations.  *Id.*  Instead, Mr. Wood instructed Mr. Ardito to improve communications with Ms. Tong regarding his American customers' account information.  *Id.* ¶ 72.

## F.   Mark Ardito Raises Concerns About Potential Breaches of Government Contracts

In summer 2018, Mr. Ardito reported his concerns to SSP management that Chinese citizen employees had access to confidential U.S. government and military

information stored on Salesforce. *Id.* ¶ 73. SSP did not restrict access to highly confidential client information on Salesforce. *Id.* Mr. Ardito did not receive a response when he reported these Salesforce security concerns in writing to management. *Id.* In 2014, SSP granted Mr. Ardito "Delegation of Authority" to sign SSP's U.S. government contracts, which made him a "Responsible Party" to ensure that SSP honored all contract terms. *Id.* ¶ 74. Government contracts required SSP to provide its employees with whistleblower training, which Mr. Ardito never received. *Id.* ¶¶ 74-75. As a Responsible Party, Mr. Ardito was vigilant about his legal obligations and was concerned when others at SSP did not treat the government's information with the same degree of protection. *Id.* ¶ 75.

In July 2018, Mr. Ardito attended a training conducted by SSP's Intellectual Assets Management Group (IAM) regarding the protection and confidentiality of intellectual property and trade secrets. *Id.* ¶ 76. At the conclusion of the training, Mr. Ardito provided written comments to IAM explaining his concerns about Chinese nationals' access to U.S. government and military applications on Salesforce. *Id.* ¶ 77. Several months passed without anyone from IAM contacting Mr. Ardito. *Id.* ¶ 78.

In September 2018, Mr. Ardito learned that SSP never limited access to specific customer accounts where confidential project information about a government agency was held, resulting in Chinese employees, including Ms. Tong, Mr. Chan and Jun Zhang, having access through Salesforce. *Id.* ¶ 79. The government project at issue was high profile. *Id.* Mr. Ardito sent out a confidential

call report about work on the project, which he logged on Salesforce. *Id.* ¶ 80. Mr. Ardito later learned that Mr. Sanner alerted SSP's Salesforce management in China to restrict access to this confidential government information, but SSP never took protective action, leaving this information vulnerable to misappropriation by the Chinese government and other Chinese customers. *Id.*

On October 19, 2018, Mr. Ardito asked for assistance from Mr. Wood and Mr. Srinivasan and independently asked each of them to be present at a one-on-one meeting with Ms. Tong, initiated by Ms. Tong. *Id.* ¶ 81. Neither Mr. Wood nor Mr. Srinivasan responded. *Id.* On November 9, 2018, Mr. Ardito made a second request for Mr. Wood and Mr. Srinivasan's assistance in his upcoming meeting with Ms. Tong, after Mr. Ardito caught a Chinese SSP affiliate colleague actively using Mr. Ardito's customer's confidential trade secret information to benefit a specific and known competitor in China. *Id.* ¶ 82. Mr. Wood and Mr. Srinivasan declined. *Id.*

Ms. Reganall informed Mr. Ardito that he should proceed with the one-on-one meeting with Ms. Tong and that leadership would not be involved. *Id.* ¶ 83. On November 14, 2018, two days before the meeting, Mr. Ardito insisted that an HR representative be present for the meeting and Kerri Williams was assigned to attend the meeting to take place at SSP's headquarters in Georgia. *Id.* ¶¶ 84-85. Prior to the meeting Mr. Ardito reached a breaking point and was hospitalized for severe anxiety and panic attacks and was under a doctor's orders not to travel to Georgia. *Id.* ¶ 85.

During this same period from September to November 2018, Ms. Tong praised Mr. West, the new west coast hire, for sharing information in collaboration with Asia-based colleagues and criticized Mr. Ardito for not sharing this same information. *Id.* ¶ 86.

### G.     Mark Ardito Files a Formal Whistleblower Complaint

Due to SSP's failure to respond to his complaints, Mr. Ardito felt he had no other option but to force HR to act by filing a formal complaint about Ms. Tong, which Mr. Ardito did on November 10, 2018, in an email to Ms. Reganall and Leesa Branch. *Id.* ¶ 88. In his email to HR, Mr. Ardito reported that the situation was extremely stressful and that he was concerned it would lead to further issues. *Id.* ¶ 89. Mr. Ardito also reported his concerns via email to Georges Houtappel, SSP's Senior Business Line Manager, on November 19, 2018. *Id.* ¶ 90. Mr. Houtappel did not respond until December 4, 2018, seventeen days later, during which time Mr. Ardito's colleagues continued to use confidential U.S. customer information and trade secrets to benefit a Chinese competitor. *Id.* ¶ 91.

### H.     SSP's Lawyers Contact Mark Ardito

On December 5, 2018, Jeffrey Koenig, SSP's Chief Employment Litigation Counsel, contacted Mr. Ardito for the first time regarding Mr. Ardito's whistleblower reports informally dating back to December 2017 and formally dating back to May 2, 2018. *Id.* ¶ 92. Mr. Koenig told Mr. Ardito that his allegations were being taken seriously and SSP would conduct a through internal investigation, which Mr. Ardito alleges never took place. *Id.* ¶ 93. Mr. Ardito further contends that Mr. Koenig's

December 5, 2018, communication is an admission that SSP delayed for seven months, and perhaps longer, before investigating his whistleblower reports. *Id.* ¶ 95.

On December 14, 2018, approximately five months after Mr. Ardito's disclosure to IAM, IAM lawyer Nikhil Patel contacted Mr. Ardito regarding his concerns as reported in July 2018. *Id.* ¶ 97. During a phone call between Attorney Patel and Mr. Ardito, Mr. Ardito again explained his concerns, specifically that Ms. Tong had unfettered access on Salesforce to a U.S. military customer account. *Id.* ¶ 98. Mr. Patel admitted that the IAM team is responsible for SSP's management of confidential information and admitted that his team had no idea how Salesforce worked. *Id.* ¶¶ 99-100. Salesforce had been the mainframe database for SSP's customer information for more than seven years. *Id.* ¶ 100. During the call Attorney Patel repeatedly stated that Mr. Ardito's concerns were "100% correct" and that SSP had "missed completely" this hole in its confidentiality and trade secret protections. *Id.* ¶ 101. Attorney Patel promised Mr. Ardito he would send him the written materials from the July 2018 training on confidentiality and trade secrets, but Attorney Patel never did. *Id.* ¶ 102.

Mr. Ardito maintains that he made diligent internal whistleblowing reports for more than seven months from May 2018 to December 2018 and that SSP took no corrective actions to stop the alleged illegal activity or prohibit retaliation against him. *Id.* ¶¶ 103-104. Instead, Mr. Ardito asserts that he was denied promotional opportunities and stripped of high-profile accounts, and that SSP altered the terms and conditions of his employment making it impossible for him to conduct his job

without violating the law or experiencing health problems. *Id.* Mr. Ardito alleges that SSP created an ongoing hostile and/or abusive work environment resulting in fear of losing his job, extreme distress, anxiety, panic attacks, and physical symptoms. *Id.* ¶ 105.

### I.   Mark Ardito Takes Medical Leave

As a result of intolerable and hostile working conditions, repeated orders to violate the law, and SSP's failure to investigate his concerns, all resulting in mental anguish and distress, Mr. Ardito asserts he had no other reasonable option but to go on medical leave from SSP around December 10, 2018. *Id.* ¶ 107. Mr. Ardito's medical condition, extreme stress, and ongoing panic attacks forced him to be out of work between December 2018 and September 2019. *Id.* ¶ 108. Mr. Ardito initially went on short-term disability for six months, and thereafter continued on long-term disability. *Id.* ¶ 109. While on long-term disability for his medical condition, Mr. Ardito received approximately 60% of his salary, thereby suffering economic damage as a result of SSP's actions. *Id.* ¶ 110. Mr. Ardito alleges that in a letter dated May 15, 2019, SSP's attorney Mr. Koenig falsely claimed that Mr. Ardito never reported his concerns regarding Salesforce. *Id.* ¶ 111. This letter exacerbated Mr. Ardito's existing medical symptoms. *Id.* ¶ 112.

Around July 3, 2019, Mr. Ardito learned from his co-workers that the HR department had announced that he was no longer employed at SSP. *Id.* ¶ 114. Because Mr. Ardito was on long-term disability, he was no longer considered employed, and SSP completely stopped paying him. *Id.* ¶¶ 114-115. Mr. Ardito contacted SSP's Benefits Center, which confirmed that he was no longer employed

and provided former employee benefit instructions, including assistance in transferring his 401K from SSP's retirement plan to an IRA. *Id.* ¶ 115.

### J. Mark Ardito Files a Complaint with the Maine Human Rights Commission

On September 4, 2019, Mr. Ardito filed a complaint with the Maine Human Rights Commission (MHRC) alleging violations of the Maine Whistleblower Protection Act (MWPA) and the Maine Human Rights Act (MHRA). *Id.* ¶ 116. Prior to his filing this complaint, SSP offered to reinstate Mr. Ardito. *Id.* ¶ 117. On September 16, 2019, Mr. Ardito returned to work at SSP but with medical restrictions, including travel restrictions related to treatment for his ongoing medical symptoms. *Id.* ¶ 118. Prior to returning to work, SSP offered Mr. Ardito two options: (1) accept a different job with different responsibilities (related to an experimental product he had worked on prior to his medical leave) and appointment to a new "Steering Committee" to investigate and address protocols and security concerns related to American customers' intellectual property; or (2) go back to his former job in the E&E market but with a reduced and/or different customer account load from the one he had. *Id.* ¶ 119. With no such protocols in place at SSP, Mr. Ardito felt he had no choice but to accept the first option. *Id.* ¶ 120.

### K. The Steering Committee

Mr. Ardito alleges that the Steering Committee failed to reach its objectives in 2019, 2020, or 2021, and has not produced any output beyond asking another SSP department to do the work assigned to it. *Id.* ¶ 122. Mr. Ardito says that the Steering Committee turned out to be a sham, meeting only on three occasions since the first

meeting on October 18, 2019.  *Id.* ¶ 123.  Mr. Ardito was the only member of the committee who was furloughed for four weeks without pay during COVID-19 and was not allowed to participate in Steering Committee teams to implement corrections to the confidentiality issues he had previously raised.  *Id.* ¶ 124.

Despite efforts to block his contributions to the Steering Committee, Mr. Ardito created a 25-slide, 90-minute PowerPoint presentation proposing a plan to correct confidentiality failures and presented it to SSP management on March 30, 2020, August 31, 2020, and February 4, 5, and 8, 2021.  *Id.* ¶ 126.  Mr. Ardito repeatedly reported his concerns to the Steering Committee, which included SSP attorney Wendy Ho, about SSP's failure to prioritize customer confidentiality.  *Id.* ¶ 127.  In his capacity as a Steering Committee member, Mr. Ardito learned in February 2021 that other SSP staff had corroborated his concerns about security vulnerabilities, misappropriation of confidential and trade secret information, and potential legal exposure.  *Id.* ¶ 128. Shortly after this, SSP restricted Mr. Ardito from receiving other information pertaining to his work on the Steering Committee, despite his ongoing work for the Committee.  *Id.* ¶ 129.

## L.    SSP Contacts Mark Ardito's Daughter

On February 18, 2020, Mr. Ardito refuted SSP's answer to his 2019 MHRC complaint and provided evidence to support his retaliation claim, which he maintains constituted protected activity under the MWPA.  *Id.* ¶ 130.  In response to SSP's request for an expedited investigation process, the MHRC communicated that it had a backlog of cases and an investigator likely would not be assigned for "several months."  *Id.* ¶ 131.

Two weeks later, on March 3, 2020, SSP sent a three-page, single-spaced demand letter to Mr. Ardito's adult daughter and her direct supervisor at the law firm where she was employed in San Diego, California. *Id.* ¶ 132. Mr. Ardito had no prior dealings with this law firm. *Id.* Mr. Ardito had not disclosed his daughter's location, or her job, and the letter disclosed sensitive and private information about Mr. Ardito that he had not discussed with his daughter or her employer on any occasion—relating to his employment at SSP and his health condition. *Id.* ¶ 133. The March 3, 2020, letter demanded that Mr. Ardito's daughter and her law firm preserve all documents related to Mr. Ardito's medical condition and living conditions from January 1, 2017, onward. *Id.* ¶ 134. The letter also instructed Mr. Ardito's daughter and her then-employer to respond to SSP's demands by Friday, March 13, 2020, or ten days later, even though MHRC had not assigned an investigator or opened the investigation. *Id.* ¶ 135.

## M.    Mark Ardito's Poor Performance Evaluation and Reduced Involvement on the Steering Committee

On November 4, 2020, Mr. Ardito provided a detailed response to the MHRC Investigator's report, further refuting SSP's answer and defenses, which Mr. Ardito asserts is also protected activity under the MWPA. *Id.* ¶ 136. On November 16, 2020, Mr. Ardito testified against SSP at the MHRC hearing, at which time MHRC issued a Notice of Right to Sue. *Id.* ¶ 137.

Approximately two months later, on January 29, 2021, SSP issued and documented, with purportedly false information, Mr. Ardito's first negative performance review after seventeen years of favorable performance evaluations. *Id.*

¶ 139.  Mr. Ardito achieved his largest ever increase in sales of over $2,000,000, 114% of SSP's defined target.  *Id.* ¶ 140.  Additionally, the Steering Committee members praised Mr. Ardito for his efforts in delivering a comprehensive proposal to improve SSP's practices for handling confidential information.  *Id.* ¶ 141.  SSP CEO Mike Finelli previously told Mr. Ardito that the Steering Committee's efforts were one of his top five priorities for the company and that the Committee would continue to be 15-20% of Mr. Ardito's responsibilities.  *Id.* ¶ 142.  Mr. Ardito achieved his remaining responsibilities with above-average price increases and successful marketing activities.  *Id.* ¶ 143.  Mr. Ardito also led efforts to improve the effectiveness of SSP's credit and collections efforts to improve on-time payment performance for two of his customers with poor payment histories.  *Id.* ¶ 144.  In other words, Mr. Ardito says that 2020 was one of his best performing years.  *Id.* ¶ 145.

Mr. Ardito alleges that his manager, Rosyln Smith, repeatedly attempted to downgrade Mr. Ardito's performance, gave false information to him and SSP's attorney, Ms. Ho, and engaged in other conduct Mr. Ardito found unethical and which he reported to Ms. Reganall at HR.  *Id.* ¶ 146.  Ms. Smith repeatedly attempted to reduce Mr. Ardito's responsibilities on the Steering Committee from 20% to 0% despite the CEO's priorities.  *Id.*  In February 2021, Ms. Smith downgraded his performance evaluation to a "poor" rating, including a score of "2" on a 1 to 5 scale as a "partial contributor."  *Id.* ¶ 147.  Mr. Ardito protested the downgrade to HR and Ms. Reganall but was not given an opportunity to appeal.  *Id.* ¶ 148.  Mr. Ardito alleges that just after his ninety-day deadline to file a lawsuit expired, SSP reduced his role

20

on the Steering Committee from approximately 20% to 3% with no underlying performance metrics. *Id.* ¶ 149. CEO Finelli stated to Mr. Ardito that he had "changed his mind" about Mr. Ardito's level of involvement in the Committee. *Id.*

### N.    Mark Ardito Files a MWPA Lawsuit

Mr. Ardito filed his Complaint in state court in February 2021, although SSP had no knowledge of the lawsuit until it was served with the Complaint on May 11, 2021. *Id.* ¶¶ 151-152. On June 5, 2021, Keri Williams, SSP's HR representative, made clear that any further discussions about promotion were "off the table." *Id.* ¶ 153. Mr. Ardito says that Ms. Williams' statement that his career at SSP was at a dead end occurred less than one month after SSP learned of Mr. Ardito's state court action. *Id.* ¶ 154. Around this same time, Mr. Ardito learned that Mr. Koenig was behind efforts to downgrade his performance and end his career at SSP. *Id.* ¶ 155. In an email to Ms. Smith and Ms. Williams, on which Mr. Ardito was copied, Mr. Koenig stated "Needless to say, we shouldn't trust him. We watch him like a hawk." *Id.*

### O.    Mark Ardito Exhausts Administrative Remedies

On September 4, 2019, Mr. Ardito filed an unlawful whistleblower retaliation claim against SSP with the MHRC. *Id.* ¶ 157. On November 18, 2020, Mr. Ardito received a Notice of Right to Sue from the MHRC. *Id.* ¶ 158. On August 31, 2021, Mr. Ardito filed another MHRC complaint covering additional adverse actions. *Id.* ¶ 161.

21

### III.   THE PARTIES' POSITIONS

#### A.   SSP's Motion to Dismiss

SSP argues that Mr. "Ardito cannot state a prima facie case because he has not plausibly alleged that [SSP] subjected him to a material adverse employment action within the statute of limitations." *Def.'s Mot.* at 8. First, SSP argues that "the Court must disregard [Mr.] Ardito's alleged adverse actions that postdate his 2019 MHRC complaint." *Id.* at 9. It contends that Mr. Ardito's allegations related to his negative performance review in January 2021, and subsequent reduced role on the Steering Committee, are the subject of a pending MHRC complaint filed August 31, 2021, and thus, these claims are not yet ripe. *Id.* SSP says that Mr. Ardito has acknowledged the ripeness issue and yet "is attempting to plead his way around MHRA's requirement that plaintiffs exhaust their claims with the Commission or surrender their right to seek monetary relief." *Id.* Ultimately, SSP's position is that those events "must be disregarded for purposes of the present Motion." *Id.* at 10.

Second, SSP submits that "[Mr.] Ardito's allegations that he was denied a job transfer, denied a promotion, and forced to transfer clients in 2017 and January 2018 are outside of the statute of limitations." *Id.* It argues that "[c]laims of retaliation under the MWPA are subject to the [two year] limitations period[] provided by the MHRA." *Id.* SSP says that a failure to promote or the forced transfer of clients are all discrete acts and the clock on filing discrimination charges for each act begins running on the date that the event allegedly occurred. *Id.* at 11. It therefore reasons that claims arising from events in 2017 and early 2018 are untimely. *Id.* at 12.

As to the promotion denial, SSP argues that it offered Mr. Ardito the west coast position, which he rejected, and by the time he changed his mind, there was already a search underway for a different employee to fill the position. *Id.* SSP emphasizes that Mr. Ardito did not allege that the position was open or that he applied for it. *Id.* at 13. SSP further argues that "[Mr.] Ardito cannot save his newly-added untimely allegations through 'relation back' to his original complaint with the MHRC and the Superior Court" because his "initial MHRC complaint makes no mention of the Sales Development Manager Position, Area Development Manager position, that he was denied a promotion, or that he was forced to transfer his clients to Mr. West." *Id.* It says that "[Mr.] Ardito's original MHRC complaint states that the 'earliest date' the alleged 'discrimination took place' was '05/02/2018.'" *Id.* at 14. SSP asserts that "the relevant inquiry is whether the[] allegations were raised in a complaint filed in court within two years of when they occurred" but Mr. Ardito "first raised . . . allegations in his FAC filed on September 7, 2021 – more than 3 years and 7 months after the events allegedly occurred" which means that "he cannot rely on them to show a *prima facie* case of employment retaliation." *Id.* at 14-15. SSP says that even if Mr. Ardito relied on his initial pleading with the Maine Superior Court, the complaint would still be time barred. *Id.* at 15.

Third, SSP argues that Mr. Ardito "has not alleged a plausible claim for failure-to-promote" because he "has not alleged that: (1) there was an open Area Development Manager position in late 2017 or early 2018, (2) that he ever applied for that position, or (3) that [SSP] hired someone with equal qualifications into that

position instead of him." *Id.* at 16.  Thus, SSP reasons that Mr. Ardito has "failed to plead the basic elements necessary for this claim and it should be dismissed." *Id.*

Fourth, SSP contends that "[Mr.] Ardito has not plausibly alleged a hostile work environment." *Id.*  It notes specifically that "the Maine Law Court has not held that a hostile work environment can constitute an adverse employment action under the MWPA" but instead "uses a standard 'concurrent with Title VII.'" *Id.* at 16-17. SSP argues that this is a high standard, and Mr. Ardito has not alleged that "supervisors or co-workers uttered offensive statements" about him, physically abused him, or harassed him in any other way.  *Id.* at 17-18.  It says that allegations of mental anguish are "insufficient to plead a 'hostile or abusive' work environment, particularly when stacked up against the multiple olive branches that SSP extended to [Mr.] Ardito." *Id.* at 18.

SSP further argues that the bar of proof is even higher for Mr. Ardito's retaliatory hostile work environment claim and he cannot build a case on "his coworker's refusals to take his side in his disagreement with his supervisor and decision to single out his Chinese colleagues by withholding information from them." *Id.* at 19.

Fifth, SSP's position is that "[Mr.] Ardito's other allegations fail as a matter of law."  *Id.*  SSP says that Mr. Ardito does not explain why he believes that SSP "materially changed the terms and conditions" of his employment, especially given that SSP offered him a position with more compensation and responsibility upon his return from medical leave.  *Id.*  As to the document preservation notice sent to Mr.

Ardito's daughter, SSP argues that an adverse action must be material, meaning that it must "dissuade a reasonable worker from engaging in protected activity," unlike the issuance of litigation notice letters which is "a routine practice by parties to ensure compliance with discovery obligations." *Id.* at 20.

### B.     Mark Ardito's Opposition

First, Mr. Ardito asserts that his allegations of "2020 and 2021 adverse actions stemming from [his] 2021 MHRC complaint [are] properly included in the Complaint." *Pl.'s Opp'n* at 5.  He disputes SSP's assertion that he is "attempting to plead his way around administrative exhaustion requirements" and instead says that he included his 2021 MHRC complaint in the First Amended Complaint to "eliminate any surprises and to allow those actions to be the subject of discovery pending a motion to amend to make those claims cognizable." *Id.*  He also says that he seeks to "avoid any future claim of prejudice by [SSP] when he seeks leave of this Court to amend his [First Amended Complaint] to conform to the issuance of the Right to Sue letter in February 2022." *Id.*  Mr. Ardito "agrees with Defendant that these adverse actions should be disregarded by the Court" and alternatively "moves to stay these proceedings until February 28, 2022 when he receives his notice of right to sue from the MHRC." *Id.* at 5-6.

Second, as to the substance of SSP's arguments, Mr. Ardito argues that he "has alleged sufficient facts of a retaliatory hostile work environment to overcome dismissal." *Id.* at 7.  He disputes SSP's assertion that because "the Main[e] Law Court has not expressly held that a hostile work environment can constitute an adverse employment action under the WPA" that the Court should not recognize a

WPA claim on his facts. *Id.* He reasons that "[judicial] construction of the MHRA and WPA has been guided by federal law," *id.* at 8 (quoting *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 13, 915 A.2d 400, 404), and that "[t]he First Circuit Court of Appeals has recognized a retaliatory hostile work environment claim in the employment discrimination context for over 15 years." *Id.* (citing *Noviello v. City of Bos.*, 398 F.3d 76, 88-90 (1st Cir. 2005)).

Mr. Ardito submits that "[a]nalyzing facts under hostile work environment standards at the pleading stage . . . is not as onerous as later stages in the proceeding," *id.* at 10, and "courts shy [away] from evaluating the specific instances of misconduct alleged in a complaint against the legal standard for hostile work environment claims, because there is no 'obligation on the pleader to identify in the complaint all the evidence that would later be offered in support of the claim pleaded.'" *Id.* at 10-11 (quoting *Fisk v. Mid Coast Presbyterian Church*, No. 2:16-cv-00490-JDL, 2017 U.S. Dist. LEXIS 68177, at *10-11 (D. Me. May 4, 2017)). Citing the First Amended Complaint, Mr. Ardito insists that he "was gaslighted, intimidated and falsely accused of misconduct," "excluded and denied support" and necessary travel, he experienced "open and direct hostility," he was "torment[ed], humilat[ed], and intimidate[d]" by his supervisor, SSP pressed him into breaching client NDAs and "fail[ed] to investigate and take his concerns seriously," all of which "contributed to physical and psychological problems that required treatment." *Id.* at 11.

Mr. Ardito submits that SSP "makes much of the fact that [he] fails to allege that his supervisors or co-workers 'uttered offensive comments' concerning him or

that 'he was physically abused or menaced by anyone at [SSP].'" *Id.* at 12 (quoting *Def.'s Mot.* at 17). In response, Mr. Ardito contends that he has presented "offensive statements" to support a retaliatory hostile work environment claim, because "offensive" literally means "causing someone to feel deeply hurt, upset or angry." *Id.* (quoting *Merriam-Webster Dictionary*). He reasons that "he was repeatedly offended by [SSP] manager comments and orders" in that his supervisors "repeatedly threatened and ordered him to participate in the misappropriation of trade secrets" resulting in "extreme stress and anxiety, deteriorating health and suffering an emotional breakdown requiring hospitalization," thus "a reasonable inference can be drawn that he was deeply hurt, upset, and harbored resentment, i.e., offended." *Id.* at 12-13. Mr. Ardito says that he "has alleged facts demonstrating adverse actions, unlawful orders, gaslighting, a 7-month failure to investigate his complaints, including a formal complaint against his manager, Ms. Tong" which he says together "plausibly constitute a retaliatory hostile work environment." *Id.* at 13.

Mr. Ardito rejects SSP's contention that it extended him "olive branches," arguing that such "olive branches" were not actually given, nor were they sincere. *Id.* He says that "management either ignored him, rebuffed him, [or] gaslighted him" and "neither [SSP]'s legal team . . . nor its compliance department took any action" and did not attempt to investigate for seven months. *Id.* at 13-14. Mr. Ardito further dismisses SSP's argument that his paid medical leave was an "olive branch" because "medical leave is a fringe benefit and [an] entitlement of all employees." Finally, Mr. Ardito says that "placing him on a Steering Committee was also a bogus 'olive branch'

because (1) the percentage of time for which he was given credit toward his performance evaluation was reduced to virtually zero . . .; (2) the Steering Committee produced no deliverables despite his diligent efforts; and (3) . . . the Committee has excluded him from meetings and other actions." *Id.* at 14. Mr. Ardito further distinguishes that his case involves conduct by supervisors rather than coworkers, and thus SSP's reference to caselaw pertaining to "failure to take sides" and related tensions among employees is misplaced. *Id.* at 14-15.

Third, Mr. Ardito argues that he "has not challenged as discrete adverse actions" SSP's "denial of a job transfer, promotion denials and forced client account transfers in 2018; rather, they are part of the retaliatory hostile work environment and are, therefore, actionable." *Id.* at 15. He contends that "Defendant's argument that claims of retaliation under the MWPA are subject to the 2-year limitations period provided by the MHRA is wrong" and that "[t]he time period can be longer than two years per the statute because the law provides that the statute of limitations runs 90 days after the MHRC has completed the case." *Id.* He also submits that SSP's actions "support a basis for liability under a 'continuing violations' theory, which 'allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is "some violation within the statute of limitations period that anchors the earlier claims.""" *Id.* at 16 (quoting *Lockridge v. Univ. Me. Sys.*, 597 F.3d 464, 474 (1st Cir. 2010) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001))). Thus, Mr. Ardito claims that "adverse actions that occurred in 2018 *during the same time* that Mr. Ardito made

28

protected disclosures that his Chinese supervisor and co-workers were illegally misappropriating trade secrets from his U.S. customers are part of the ongoing retaliatory hostile work environment, precluding dismissal." *Id.* at 17 (emphasis in original).

Fourth, Mr. Ardito argues that the "Defendant's abrupt contact with [his] daughter and her law firm in California with irrelevant discovery demands altered [his] terms and conditions of employment by intimidating him and seeking to dissuade him from pursuing his internal and MHRC complaints." *Id.* To begin, Mr. Ardito disputes that he admitted that upon his return from leave he was offered a better position "with more compensation and responsibilities." *Id.* at 18 (quoting *Def.'s Mot.* at 19). He says that he was "offered a Hobson's Choice" to either go back to his original position where he would be forced to participate in the misappropriation of trade secrets or accept a less prestigious job with accompanying work on the "sham" Steering Committee. *Id.*

Mr. Ardito submits that he did experience an adverse employment action because "he was divested of significant and lucrative job responsibilities and given disadvantageous job assignments . . . despite his career plan, years of exemplary job performance . . . and previous statements by SSP management that he was in line for promotion." *Id.* at 19. Moreover, he explains that "[w]hile litigants may routinely issue litigation hold letters during pending litigation, there was no pending investigation by MHRC and no 'litigation' in the form of a lawsuit." *Id.* at 20. Mr. Ardito concludes that SSP's letter "was not a traditional litigation hold letter seeking

merely to preserve material[s]" because the letter sought "expansive and irrelevant document[s]" about Mr. Ardito's "medical condition, activities, whereabouts, and lifestyle and living conditions." *Id.*

### C.    SSP's Reply

In reply, SSP claims that "[Mr.] Ardito agrees that his allegations regarding a negative performance review and decreased participation on the Steering Committee in 2021 post-date [his] September 2019 MHRC complaint, are not part of this lawsuit, and should not be considered on SSP's motion to dismiss. *Def.'s Reply* at 1.  Moreover, SSP submits that "[Mr.] Ardito's 'failure to promote or transfer' and 'transfer of clients' allegations fail" because the "continuing violation" doctrine does not apply here. *Id.* at 2.  It says that "[t]o invoke the continuing violation doctrine, [Mr.] Ardito must demonstrate similarity and a substantial relationship between the timely and untimely acts," which he has not done. *Id.* at 2-3.  Alternatively, SSP argues that Mr. Ardito's allegations present "discrete acts" that fall outside the scope of the doctrine. *Id.* at 3.

SSP reasserts that Mr. Ardito's "retaliatory hostile work environment claim is not cognizable under the MWPA as a matter of law" because, despite his insistence that the Court can look to federal law recognizing such claims for guidance, "[c]ourts applying Maine law have ruled on such claims for decades, under appropriate statutory predicates [which do not interpret "adverse action" to include a retaliatory hostile work environment], yet no court has ever permitted an MWPA claim to move forward under a retaliatory hostile work environment theory." *Id.* at 4.  SSP also repeats that "[Mr.] Ardito's allegations cannot meet the standard for pleading that he

was subjected to a hostile work environment," because although Mr. Ardito "identifies the allegations that he thinks state a retaliatory hostile work environment claim" the First Amended Complaint "do[es] not actually contain the factual material he purports to recite in his brief. *Id.* at 5.

Finally, SSP concludes that its "document preservation letters were not retaliatory acts" and says that Mr. Ardito's reliance on *Rivera-Rivera v. Medina Medina, Inc.*, 898 F.3d 77 (1st Cir. 2018), is unpersuasive because the case is factually distinguishable. Id. at 7.

### D.     The Praecipe

In his praecipe, Mr. Ardito attaches his March 1, 2022, right-to-sue letter as proof that he exhausted his administrative remedies and asks the Court to "take judicial notice of [the] document." *Pl.'s Praecipe* at 1.  In its objection to Mr. Ardito's praecipe, SSP argues that Mr. Ardito "provides no rationale to grant his request for judicial notice" and "fails to explain how judicial notice of the Commission's Right-to-Sue letter would bolster his opposition to SSP's Motion to Dismiss the First Amended Complaint." *Def.'s Opp'n to Praecipe* at 1.  SSP further contends that "because [Mr.] Ardito has not sought leave to inject his latest allegations against SSP into this case through another amendment [of the complaint], the Right-to-Sue letter is not relevant to [the] resolution of SSP's Motion to Dismiss." *Id.* at 2.  SSP concludes by reiterating its argument that dismissal is appropriate regardless of Mr. Ardito's latest right-to-sue letter. *Id.* at 3.  In reply, Mr. Ardito asserts that the allegations implicated by his latest right-to-sue letter are already before the Court in the First Amended Complaint and that no further amendment is needed. *Pl.'s Reply to Def.'s*

31

*Opp'n to Praecipe* at 2.  As a result, Mr. Ardito submits that the Court may take judicial notice of the March 1, 2022, letter pursuant to Federal Rule of Evidence 201. *Id.* at 1-2.

## IV.  LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)).  This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'"  *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis."  *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations

(which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.   DISCUSSION

### A.   The Maine Whistleblowers' Protection Act and the Maine Human Rights Act

In his First Amended Complaint, Mr. Ardito alleges that SSP retaliated against him in violation of the Maine Whistleblowers' Protection Act (MWPA) and the Maine Human Rights Act (MHRA). The MWPA provides, in relevant part:

> **1. Discrimination prohibited.** No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:
>
>> **A.** The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

26 M.R.S. § 833(1)(A).  The plaintiff has the "undemanding task of demonstrating a prima facie case[3] of unlawful retaliation."  *Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 64 (D. Me. 2010) (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991)).  To establish a prima facie case of retaliation under the MWPA the plaintiff must show: "(1) []he engaged in activity protected by the statute, (2) []he was the subject of adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action."[4]  *Sullivan v. St. Joseph's*

---

[3]     The First Circuit stated that "[t]he prima facie standard is an evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013).  Because the prima facie "elements are part of the background against which a plausibility determination should be made" the Court uses these elements "as a prism to shed light upon the plausibility of [Mr. Ardito's] claim." *Id.* at 54.  To the extent that Mr. Ardito properly alleges a prima facie case, "it ipso facto satisfies the plausibility standard." *Corson v. Modula, Inc.*, No. 2:20-CV-104-DBH, 2020 U.S. Dist. LEXIS 128437, at *14 (D. Me. July 21, 2020) (concluding that where the plaintiff meets the prima facie standard in her complaint, she simultaneous pleads a plausible claim to defeat a motion to dismiss).

[4]     As this Court has recognized, there is tension between the statutory language of the MHRA and MWPA:

> Maine courts have adopted the language of section 833 with regard to all three elements of an MWPA action even though section 4572, which is the conduit for an MWPA action, defines adverse employment action differently than section 833.  Section 833 limits adverse employment action to discharging, threatening, and otherwise discriminating "against an employee regarding the employee's compensation, terms, conditions, location[] or privileges of employment;" section 4572 has a broader scope, defining unlawful employment discrimination as "to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions, or privileges of employment or any other matter directly or indirectly related to employment" because of an employee's protected activity.  5 M.R.S. § 4572.  The clause, "any other matter directly or indirectly related to employment," contemplates a broader scope of employer conduct that could be considered adverse employment action.  It is uncertain how this language applies to MWPA claims, but since section 4572 is the provision providing a right of action to whistleblowers, the Court is reluctant to view it as surplusage.

*Charette*, 332 F. Supp. 3d at 356 n.41 (quoting *Thayer Corp. v. Reed*, No. 2:10-cv-00423-JAW, 2011 U.S. Dist. LEXIS 74229, at *60-61 (D. Me. July 11, 2011)).  Here, however, Mr. Ardito alleged violations of the MRHA retaliation provision, 5 M.R.S. § 4633, rather than section 4572, although both provisions prohibit the same or similar conduct and provide for the same remedies.  *See Gallagher v. Penobscot Cmty. Healthcare*, No. CV-16-54, 2017 Me. Super. LEXIS 215, at *10-11 (Me. Super. Ct. Mar. 21, 2017) (explaining the scope of protection and remedies available under § 4633 and § 4572).

*Rehab. & Residence*, 2016 ME 107, ¶ 14, 143 A.3d 1283 (internal quotation marks omitted).

Similarly, pursuant to the MHRA,[5] "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S. § 4633. As with the MWPA, a plaintiff bringing a claim for retaliation under the MHRA "must show that: (1) he engaged in protected conduct under the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action." *Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 58 (1st Cir. 2002).

## B. Administrative Exhaustion and the Statute of Limitations under the MHRA and MWPA

To begin, the Court resolves the parties' dispute over Mr. Ardito's right to sue letter and his praecipe filed March 5, 2022, and their initial arguments that certain alleged adverse actions fall outside of the statute of limitations.

### 1. Mark Ardito's 2022 Right-To-Sue Letter

SSP argues that Mr. Ardito's right-to-sue letter is an "irrelevant distraction[]" from its motion to dismiss because he gave "no rationale to grant his request for judicial notice [of the right-to-sue letter]" and has not filed a motion to amend his First Amended Complaint to include the right-to-sue letter. *Def.'s Opp'n to Praecipe*

---

[5]   "The MWPA and the MHRA do not contemplate separate whistleblower causes of action. Rather, the MHRA provides a cause of action to persons aggrieved by violations of the MWPA." *Thayer*, 2011 U.S. Dist. LEXIS 74229.

at 1-2.   In turn, Mr. Ardito contends that he has exhausted all administrative remedies and filed the right-to-sue letter with the Court as evidence of such.   *Pl.'s Reply to Def.'s Opp'n to Praecipe* at 1.   Mr. Ardito submits that the First Amended Complaint already contains all allegations that he brought before the MHRC, so upon issuance of the right-to-sue letter "such adverse actions are properly before this Court for resolution through his First Amended Complaint."   *Id.* at 2.

The MHRA[6] provides that a plaintiff may not seek attorney's fees or damages under the Act "unless [he] *alleges and establishes* that, prior to the filing of the civil action, [he] first filed a complaint with the commission and the commission . . . [i]ssued a right-to-sue letter."   5 M.R.S. § 4622(1) (emphasis added).   The MHRA administrative exhaustion requirement is not a jurisdictional requirement but rather a condition precedent for recovery under the Act.   *Robertson v. Barber Foods, LLC*, No. 2:19-cv-00455-NT, 2020 U.S. Dist. LEXIS 102437, at *9-11 & n.3 (D. Me. June 11, 2020) (citing 5 M.R.S. § 4622; *Burnett v. Ocean Props. Ltd.*, 2:16-cv-00359-JAW, 2017 U.S. Dist. LEXIS 55059, at *22 (D. Me. Apr. 11, 2017)); *see also Walton v. Nalco Chem. Co.*, 272 F.3d 13, 20-21 (1st Cir. 2001) ("[S]ection 4622 more closely resembles a condition precedent" than an affirmative defense).

To adequately plead a condition precedent, such as the MHRA administrative exhaustion requirement, a party must "allege generally that all conditions precedent have occurred or been performed."   FED. R. CIV. P. 9(c); *see also* 5A CHARLES ALAN

---

[6]   "Maine . . . whistleblower protections laws contain the same administrative exhaustion requirement."   *Cole v. Maine*, No. 1:17-cv-00071-JAW, 2018 U.S. Dist. LEXIS 163857, at *47 (D. Me. Sept. 25, 2018) (quoting *Burnett v. Ocean Props. Ltd.*, 327 F. Supp. 3d 198, 232 (D. Me. 2018)).

WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1302 (4th ed. 2021) ("Notwithstanding variations among the states in pleading practice, Rule 9(c) applies in all actions in the federal courts, even when the pleading practice in the state in which the court is sitting is different"). Thus, the First Circuit has stated that "the appropriate inquiry . . . is whether either the original or amended complaint include[s] an *adequate* 'general averment' that [the plaintiff] had met all conditions precedent to the recovery of damages under the MHRA, even [if] neither complaint explicitly allege[s] that [the plaintiff] . . . filed an MHRC charge." *Walton*, 272 F.3d at 22 (emphasis in original).

Mr. Ardito's First Amended Complaint expressly alleges that retaliation in the form of SSP "fabricating information to issue negative performance evaluations in 2021, stripping him of certain job duties to his detriment and stating that his current job duties have no promotional potential" prompted him to file a second MHRC complaint on August 30, 2021. *First Am. Compl.* ¶ 5. At the time of the First Amended Complaint, Mr. Ardito acknowledged that the MHRC had not yet granted him a right-to-sue letter on these claims, *id.*, but he "proffer[ed in his opposition to the motion to dismiss] . . . that no MHRC investigation will take place because of [his] stated intention [to the MHRC] to seek a Notice of Right to Sue at the expiration of the 180-day deadline to include those adverse actions in this lawsuit for adjudication." *Pl.'s Opp'n* at 7. Thus, it is clear through Mr. Ardito's First Amended Complaint and his opposition to SSP's motion to dismiss that he "placed [SSP] on reasonable notice that he was claiming compliance with section 4622" pending receipt

of the right-to-sue letter, which he alleged he would receive at the end of February 2022. *Walton*, 272 F.3d at 23; *see also Stroudwater Assocs. v. Kirsch*, No. 2:21-cv-00086-NT, 2021 U.S. Dist. LEXIS 234000, at *39-40 (D. Me. Dec. 7, 2021) (crediting plaintiffs with putting the defendant "and the Court on Notice that [employment discrimination] claims were coming down the pike" before receiving their right-to-sue letter). Mr. Ardito has thus provided SSP with notice that he filed a charge of discrimination with the MHRC and pled the condition precedent to seek attorney's fees or damages.

Although Mr. Ardito could not establish exhaustion at the time of filing the First Amended Complaint, because the 180-day period had not yet lapsed, the Notice of Right to Sue issued March 1, 2022, nonetheless establishes exhaustion because it is the type of extrinsic document the Court may consider in resolving the pending motion to dismiss the First Amended Complaint.

In deciding a motion to dismiss "a court may not [ordinarily] consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). There is a "narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" *Id.* (quoting *Watterson*, 987 F.2d at 3); *see also Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 74 (1st Cir. 2014) (same); *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1,

8 (1st Cir. 2020) (enumerating exceptions recognized by the First Circuit).  When an exception is met, the extrinsic document "effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

Notably, the First Circuit has held that a right-to-sue letter falls within the parameters of the narrow *Alternative Energy* exception.  *See Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005) (explaining on a motion to dismiss that the district court properly considered a right-to-sue letter forming the basis of a plaintiff's administrative exhaustion claim even though it was not "annexed" to the complaint).  As such, the Court may consider Mr. Ardito's March 1, 2022, right-to-sue letter as part of the First Amended Complaint.  Furthermore, SSP does not dispute that the Court may properly consider the right-to-sue letter without converting the motion to dismiss into one for summary judgment.  *See Def.'s Opp'n to Pl.'s Praecipe* at 2 ("SSP does not dispute that the Right-to-Sue letter is such a 'source' that, if relevant to SSP's Motion to Dismiss, the Court could consider without 'converting' the Motion to Dismiss 'into a motion for summary judgment'" (quoting *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013)).  Considering the right-to-sue letter as incorporated in the First Amended Complaint, Mr. Ardito has both sufficiently alleged and established that he has met the administrative exhaustion requirements pursuant to Rule 9(c).  The Court may therefore consider the allegations in the 2021 MHRC complaint, as detailed in Mr. Ardito's First Amended Complaint, in resolving the pending motion to dismiss.

To the extent that SSP argues that "[Mr.] Ardito has not sought leave to inject his latest allegations against SSP into this case through another amendment," *id.*, Mr. Ardito says that the "adverse actions [which are the subject of the new right-to-sue letter] have already been included in his First Amended Complaint for expediency." *Pl.'s Reply to Def.'s Obj. to Praecipe* at 2. The Court agrees. Mr. Ardito does not seek to add any new allegations to the First Amended Complaint save notification that he received the right-to-sue letter, which, as the Court previously noted, may be incorporated into the First Amended Complaint by way of the *Alternative Energy* exception. Mr. Ardito need not amend his First Amended Complaint solely to state that he has exhausted his administrative remedies, when the Court may already otherwise consider the right-to-sue letter itself. The Court concludes that Mr. Ardito has alleged administrative exhaustion.

### C. Whether Alleged Retaliatory Actions in 2017 and 2018 are Subject to the MHRA & MWPA Statute of Limitations

SSP contends that Mr. Ardito's allegations that it denied him a job transfer, denied him a promotion, and forced the transfer of his clients in 2017 and 2018 should be dismissed because they fall outside of the statute of limitations as more than two years passed between when the alleged acts occurred and when Mr. Ardito commenced this action. *Def.'s Mot.* at 10. Specifically, SSP says that the Court should "analyze each alleged discriminatory or retaliatory act" to determine whether each allegation falls within the statute of limitations period. *Id.* at 11. Mr. Ardito contends that because he grounds his complaint in a retaliatory hostile work environment, actions that would not be considered "materially adverse" standing alone "may

40

collectively amount to a retaliatory hostile work environment." *Pl.'s Opp'n* at 16.  He further alleges that even if some of the actions underlying his claim fall outside the applicable statutory period, they still support liability under a "continuing violations" theory.  *Id.*

The MHRA provides that "[t]he action must be commenced not more than . . . 2 years after the act of unlawful discrimination complained of."[7]   5 M.R.S. § 4613(2)(C).  The "two-year limitation period begins to run when an employee receives 'unambiguous and authoritative notice of the discriminatory act.'"  *Berounsky v. Oceanside Rubbish, Inc.*, 2022 ME 3, ¶ 9, 266 A.3d 284 (quoting *LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 15, 909 A.2d 629).  "The discriminatory act needs to 'have a degree of permanence, sufficient to put a reasonable claimant on notice of discrimination,' and '[m]ere suspicion and rumor are insufficient.'"  *Id.* (quoting *Lepage,* 2006 ME 130, ¶ 11, 909 A.2d 629).

However, the Maine Supreme Judicial Court "distinguishe[s] claims arising from discrete acts of discrimination from claims arising from a hostile work environment involving an aggregation of a series of acts in which the "'unlawful employment practice" . . . cannot be said to occur on any particular day.'"  *LePage*, 2006 ME 130, ¶ 12, 909 A.2d 629 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002)); *see also Franchina*, 881 F.3d at 47 ("Hostile work environment

---

[7]      MWPA claimants are subject to the same pre-filing arbitration requirements and statute of limitations.  *See* 26 M.R.S. § 834-A; *Faile v. Maine*, No. 1:12-CV-00055-JAW, 2012 U.S. Dist. LEXIS 128944, at *20-21 (D. Me. Aug. 6, 2012) ("Claims of discrimination that are advanced under the MHRA/MWPA must be commenced within two years of the act of unlawful discrimination unless a later filing date is allowed by virtue of the delay occasioned by an administrative process" (citing 5 M.R.S. §§ 4613(2)(C), 4622(1))).

claims . . . generally do not turn on single acts but on an aggregation of hostile acts extending over a period of time.  For this reason, an equitable exception to the 300-day filing period is recognized under Title VII for the ongoing patterns of discrimination that are part and parcel with hostile work environment claims"); *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009) ("[A] hostile work environment claim cannot be said to occur on any particular day" because "the actionable wrong is the environment not the individual acts that, taken together, create the environment" (quoting *Ledbetter v. The Goodyear Tire & Rubber Co.*, 550 U.S. 618, 638 (2007))).  Where a plaintiff has alleged a hostile work environment, rather than discrimination or retaliation by discrete acts, "it does not matter . . . that some of the alleged acts fall outside the statutory time period, so long as an act that forms part of the basis of the claim occurs within the period."  *Willey v. Cty. of York*, No. CV-15-0120, 2017 Me. Super. LEXIS 182, at *9 (Me. Super. Ct. Oct. 10, 2017) (citing *Morgan*, 536 U.S. at 117); *see also Cordero-Suárez v. Rodríguez*, 689 F.3d 77, 82 (1st Cir. 2012).[8]

---

[8]     In the alternative, Mr. Ardito argues that the continuing violations doctrine saves his claims from being time-barred.  "[T]he continuing violations doctrine applies where 'a number of discriminatory acts emanate from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII."  *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 54 (1st Cir. 1999) (quoting *Jensen v. Frank*, 912 F.2d 517, 522 (1st Cir. 1993)).  In *O'Rourke v. City of Providence*, the First Circuit explained that "there is a natural affinity between the hostile work environment theory and the continuing violation doctrine . . . [y]et the two theories are not the same and not every hostile work environment claim presents a plausible continuing violation."  235 F.3d at 727.  The *O'Rourke* Court "decline[d] to adopt a per se rule that a properly alleged hostile work environment claim also constitutes a continuing violation."  *Id.* at 727-28.  The Law Court has not definitively resolved whether the continuing violations doctrine is cognizable under Maine law, *see McKinnon v. Honeywell Intern., Inc.* 2009 ME 69, ¶ 14, 977 A.2d 420 ("Although [the Law Court has] discussed the possible applicability of the [continuing violations] doctrine in the context of employment discrimination . . . [it has] never adopted the continuing violations doctrine as a means of tolling the statute of limitations"), but the Court need not resolve that issue here because of the nature of Mr.

Here, Mr. Ardito filed his claim in state superior court on February 17, 2021. SSP is therefore correct that all *discrete* retaliatory acts predating February 17, 2019, are time barred. Importantly, however, Mr. Ardito present a claim for a retaliatory hostile work environment rather than discrete retaliatory occurrences. Specifically, Mr. Ardito contends that SSP retaliated against him by creating a hostile work environment beginning in 2018 but continuing until 2021. In other words, the occurrences underlying the alleged hostile work environment fall both inside and outside the two-year statute of limitations. Because some of the alleged actions would not be time barred as discrete incidences, *all* alleged actions that constitute a continuing hostile work environment may be considered in this action. *See id.*

Although the Law Court has not definitively resolved whether retaliatory hostile work environment claims are cognizable under Maine law, as discussed in greater detail below, the Court concludes that the Law Court would likely recognize a retaliatory hostile work environment claim if faced with the question. Because the alleged wrong that Mr. Ardito challenges is the working environment itself, the Court concludes that SSP's acts that Mr. Ardito says constitute a pattern of retaliation are

---

Ardito's claim. The actionable wrong Mr. Ardito alleges is the hostile work environment itself, rather than SSP's discrete acts or a serial violation. Thus, Mr. Ardito's underlying claim bypasses the need to address and apply the continuing violations doctrine.

Even if the Court had to apply the continuing violations doctrine, Mr. Ardito's claim would still survive dismissal because SSP's actions could be considered a "serial violation." *See Thomas*, 183 F.3d at 53. Accepting Mr. Ardito's allegations as true, each of SSP's allegedly retaliatory acts could be described as "emanating from the same discriminatory animus" of punishing Mr. Ardito for reporting what he perceived to be illegal conduct by SSP employees. Moreover, because Mr. Ardito made a series of reports over time, it could plausibly have taken time for him to foresee that SSP's actions created a pattern of repeated retaliatory acts. *See id.* at 54 ("The continuing violation doctrine ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory").

alleged as part of a hostile work environment rather than as discrete acts. As a result they are not time barred.

### D.     Mark Ardito's MWPA and MHRA Claims

The Court must next consider whether Mr. Ardito has stated plausible claims for violations of the MWPA and MHRA. Although Mr. Ardito need not allege a prima facie case to survive dismissal at this stage, the Court looks to the prima facie elements as a framework for its analysis. The Court therefore considers whether Mr. Ardito has plausibly alleged (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and adverse employment action.

### 1.     Protected Activity

Under Maine law, an employee engages in a protected activity if he "reports orally or in writing to the employer . . . what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States." 26 M.R.S. § 833(1)(A). To fall within the purview of the MWPA, "the employee must first bring 'the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer' and 'allow [] the employer a reasonable opportunity to correct that violation, condition or practice unless the employee has specific reason to believe that the reports to the employer will not result in correction of the violation." *Osher*, 703 F. Supp. 2d at 66 n.15 (quoting 26 M.R.S. § 833(2)). "[T]he complained-of-conduct need not actually be illegal, but the employee must prove that a reasonable person might have believed that it was." *Id.* at 66 (quoting *Tripp v. Cole*, 425 F.3d 5, 9 (1st

Cir. 2005)).  However, the report must be made in good faith.  *See Hall v. Mid-State Machine Prods.*, No. 11-CV-068, 2013 Me. Super. LEXIS 169, at *15-16 (Me. Super. Ct. Sept. 4, 2013) (citing *Gammon v. Crisis & Counseling Ctrs.*, 762 F. Supp. 2d 165, 182-83 (D. Me. 2011)).  "The good faith analysis begins with an assessment 'of whether the purported whistleblower made h[is] complaints for the purpose of exposing illegal or unsafe practices.'"  *Id.* at *16 (quoting *Gammon*, 762 F. Supp. 2d at 183).  In its motion to dismiss, SSP does not dispute that Mr. Ardito engaged in a protected activity but it reserves the right to contest that point later.  *Def.'s Mot.* at 8 n.4.

For the purposes of this motion to dismiss, the Court agrees that Mr. Ardito has properly alleged a protected activity.  First, Mr. Ardito made several reports, both orally and in writing, to his direct supervisors, including to Ms. Tong, Mr. Wood, Mr. Sanner, and Mr. Houtappel about conduct of SSP employees.  *See First Am. Compl.* ¶¶ 33-34, 38-39, 69-70, 90.  He also reported to Ms. Reganall in HR, and spoke with Mr. Srinivasan and Ms. Ho in their capacities as SSP's attorneys.  *Id.* ¶¶ 44-46, 69, 76, 89-90.  In other words, Mr. Ardito has more than sufficiently alleged that he brought his concerns to the attention to his superiors.  *See Valentin-Almeyda*, 447 F.3d at 94 (holding that administrative complaints and oral complaints to supervisors constitute "protected activity").

Mr. Ardito has also alleged that he reasonably believed that Ms. Tong and her other direct reports were engaged in illegal conduct.  Based on Mr. Ardito's knowledge and understanding of the NDAs and the nature of the confidential information

provided to SSP by its customers, it was reasonable for Mr. Ardito to believe that an apparent breach of such an agreement may be in violation of federal or state law. *See Tripp*, 425 F.3d at 9 ("[T]he complained-of conduct need not *actually* be illegal, but the employee must prove that a reasonable person might have believed that it was") (internal quotation marks omitted) (emphasis in original); *Thayer*, 2011 U.S. Dist. LEXIS 74229, at *64 ("[Plaintiff] need not have identified in his Complaint what law he believes was violated since all that is required is his good faith belief 'that it crosses the line' when he complained to the employer—not whether such a belief was legally correct"). Furthermore, in his email to Mr. Wood in September 2018, Mr. Ardito stated that he was raising his concerns with his superiors to shield SSP and himself from liability. *First Am. Compl.* ¶ 63. Taking these facts as true, it is reasonable to conclude that Mr. Ardito made the reports and disclosures in good faith belief that the complained of conduct was illegal.

Finally, Mr. Ardito has sufficiently alleged that he gave SSP sufficient time and opportunity to correct the alleged misconduct. Mr. Ardito's first disclosure was made to Ms. Tong and Mr. Sanner in January 2018 and he escalated his disclosures in May 2018 by contacting the SSP legal department. Mr. Ardito alleges that he was not contacted by anyone from SSP until December 2018. *Id.* ¶ 91. Even assuming that Mr. Ardito's first major disclosure occurred in May 2018, a period of seven months is sufficient to establish that he gave SSP ample opportunity to address his concerns. Mr. Ardito has sufficiently alleged that he engaged in a protected activity.

### 2.      Adverse Employment Action

Under the MWPA "[a]n adverse employment action is an action that materially changes the conditions of an employee's employment," *Sullivan*, 2016 ME 107, ¶ 14, 143 A.3d 1283, and under the MHRA such an action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 356 (D. Me. 2018) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "An employee has suffered an adverse employment action when the employee has been deprived either of 'something of consequence' as a result of a demotion in responsibility, a pay reduction, or termination, or the employer has withheld "an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service." *LePage*, 2006 ME 130, ¶ 20, 909 A.2d 629 (quoting *Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir. 1996)). Here, Mr. Ardito contends that he "is not seeking relief for discrete adverse actions" namely, denial of a job transfer, denial of a promotion, and the forced client account transfers. *Pl.'s Opp'n* at 15-16. Instead, he submits that these discrete acts "are part of the pervasive orders to violate the law, castigation, intimidation and threats for Mr. Ardito's refusal to violate the law, and other actions from May through December 2018." *Id.* at 16.

### a.      Whether Hostile Work Environment is a Cognizable "Adverse Action" under the MHRA and MWPA

As both parties note, the Law Court has "not yet addressed whether a hostile work environment claim can constitute an adverse employment action pursuant to

the WPA." *Blake v. State,* 2005 ME 32, ¶ 10, 868 A.2d 234; *see also LaCourse v. HallKeen Mgmt., Inc.*, No. 2:10-cv-420-GZS, 2011 U.S. Dist. LEXIS 98315, at *57-59 (D. Me. Aug. 31, 2011); *Bodman*, 787 F. Supp. 2d at 110 ("To date, however, it remains an open question in Maine whether a retaliatory hostile work environment (and resulting constructive discharge) constitutes an adverse employment action in the context of a MWPA claim"); *Doyle v. Dep't of Hum. Servs.*, 2003 ME 61, ¶ 24 n.14, 824 A.2d 48 ("We do not reach DHS's argument that the MHRA does not recognize a claim for a hostile work environment because, assuming that such a claim is cognizable, the undisputed facts do not demonstrate a hostile incident or incidents of sufficient severity or pervasiveness to constitute a hostile work environment").

Because the Law Court has yet to decide this issue, SSP argues that "[t]his Court should not create new state law by recognizing this claim under the MWPA." *Def.'s Mot.* at 17. Although SSP is correct that "[i]t is not [the federal court's] role to expand Maine law," *Douglas*, 433 F.3d at 149, the First Circuit has also stated that "[w]here the state's highest court has not definitively weighed in, a federal court applying state law 'may consider analogous decisions, consider[] dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" *Janney Montgomery Scott LLC v. Tobin*, 571 F.3d 162, 164 (1st Cir. 2009) (quoting *N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 38 (1st Cir. 2001)). In such circumstances, the federal court "must 'make an informed prophecy—to discern the rule the state's highest court would be most likely

to follow under these circumstances, even if our independent judgment might differ.'" *Id.* (quoting *Lapalme*, 258 F.3d at 38 (internal quotation marks omitted)).

The Court acknowledges that this a complicated issue, however this is not the first time this District and the First Circuit have been faced with deciphering state law absent explicit guidance from the highest state court. *See, e.g.*, *Noviello*, 398 F.3d at 91 (looking to federal law in the absence of precedent from the Massachusetts Supreme Judicial Court in determining whether Massachusetts law permitted claims for retaliatory hostile work environments); *Thayer*, 2011 U.S. Dist. LEXIS 74229, at *54-55 (comparing federal law and Maine law on a motion to dismiss to resolve whether the MWPA applied to former employees, which was an open question under Maine law).

Consistent with the First Circuit's analysis in *Noviello v. City of Boston*, the Court first considers Title VII, the federal analogue of the MHRA and MWPA antiretaliation provisions. The *Noviello* Court began by comparing the language of Title VII's operative and anti-retaliation provisions. *Noviello*, 398 F.3d at 88-90. The operative provision makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or nation origin." 42 U.S.C. § 2000e-2(a)(1). Based on this language, and Congress' intent "'to strike at the entire spectrum of disparate treatment . . . in employment, which includes requiring people to work in a discriminatorily hostile or abusive work environment'" the First Circuit concluded that "the verb 'discriminate' . . . logically includes subjecting a person to a

49

hostile work environment." *Noviello*, 389 F.3d at 90 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Thayer*, 2011 U.S. Dist. LEXIS 74229, at *57 (discussing the "linguistic differences between Title VII's substantive antidiscrimination and anti-retaliation provisions" as observed by the United States Supreme Court in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)).

Turning to the language of Title VII's anti-retaliation provision, which "directs an employer not to discriminate against any employee 'because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII],'" *Noviello*, 389 F.3d at 90 (quoting 42 U.S.C. § 2000e-3(a)), the First Circuit concluded that because the operative provision of Title VII clearly stated Congress' intention to prevent discrimination in the form of a hostile work environment under the statute, it would be inapposite to read the anti-retaliation provision more restrictively. *Id.* (applying the canon of interpretation that "[a] term appearing in several places in a statutory text is generally read the same way each time it appears" (quoting *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994))).

Indeed, the First Circuit reasoned that the anti-retaliation provision's use of the word "discrimination" without qualification was evidence that the provision intended to "prohibit *any* discrimination that is reasonably likely to deter protected activity," including subjecting an employee to a hostile work environment. *Id.* (quoting *EEOC Compl. Man.* (CCH) P 8005, § 8-11.D.3 (2004)). Importantly, when faced with whether Massachusetts law also recognized a retaliatory hostile work

environment, the First Circuit concluded that "the [Massachusetts] statute's anti-discrimination and anti-retaliation provisions are very similar to the counterpart provisions contained in Title VII." *Id.* at 91. The First Circuit concluded that "were the [SJC] squarely presented with the question, it would find a retaliatory hostile work environment to be an adverse employment action." *Id.* at 90-91.

Applying the First Circuit analytic approach, the Court concludes that if faced with the same question, the Law Court would likely permit a retaliatory hostile work environment claim based on the similarity of the MHRA and MWPA to both Title VII and the Massachusetts law[9] in *Noviello*. First, the same linguistic similarities that the First Circuit recognized between Title VII's anti-retaliation provision and the Massachusetts law exist between Title VII and the MHRA and MWPA. The MHRA states that "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S. § 4633(a). The MWPA similarly provides that "[n]o employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms,

---

[9]    Chapter 151B of the Massachusetts General Laws states that it is unlawful:

For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

Mass. Gen. Laws ch. 151B, §4(4).

conditions, location or privileges of employment because" the employee reported what they reasonably believed to be a violation of the law.  26 M.R.S. § 833(1)(A).

As in Title VII and Massachusetts Chapter 151B, the word "discriminate" noticeably lacks a qualifier in both the MHRA and MWPA.  Moreover, the phrase "or otherwise discriminate" in the MWPA suggests that the Maine Legislature, like Congress, did not mean to limit actionable types of retaliation solely to employee "discharge" or "threat[s]."  In fact, in *LePage*, the Law Court held that "[u]nlike 42 U.S.C.S. § 2000e-3(a), which simply prohibits 'discrimination' in response to a protected activity, the MWPA specifically defines discrimination by stating that '[n]o employer may discharge, *threaten* or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment." *Id.* (emphasis in *LePage*) (quoting 26 M.R.S. § 833(1)).  The Law Court thus interpreted the statutory language as being broader than Title VII, which is consistent with the reading the Court adopts here.

This conclusion is further consistent with the MHRC Rules and Regulations which provide that "[c]onsistent with the public policy underlying the Act (as expressed in §4552), and with firmly established principles for the interpretation of such humanitarian legislation, the remedial provisions of the Act shall be given broad construction and its exceptions shall be construed narrowly." *Me. Hum. Rts. Comm'n Reg.* ch. 3, § 1(3)(A); *see also Wells v. Franklin Broadcasting Corp.*, 403 A.2d 771, 773 (Me. 1979) ("The legislative history of the [Maine Human Rights Act] indicates that

it was meant to have very broad coverage" (quoting *Me. Hum. Rts. Comm'n v. Local 1361, Me.*, 383 A.2d 369, 373 (1978)).

Finally, this Court similarly concluded in *Thayer Corporation v. Reed* that the MWPA should be broadly construed.  In *Thayer*, the Court relied on *Burlington Northern* to conclude that a narrow interpretation of Maine's anti-retaliation provision would foreclose an entire category of plaintiffs, a result inconsistent with the purpose of statutory antiretaliation provisions.  2011 U.S. Dist. LEXIS 74229, at *58-60.   The Court noted that in *Burlington Northern*, the Supreme Court characterized Title VII's antiretaliation provision as a means to prevent discrimination by "preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id.* at *58 (quoting *Burlington N.*, 548 U.S. at 63) (alteration in *Thayer*). The Court explained that the Supreme Court construed the antiretaliation provision broadly to "deter the many forms that effective retaliation can take." *Id.* at *59 (quoting *Burlington N.*, 548 at 63).  The Court ultimately concluded that "the same justifications the *Burlington Northern* Court identified for the Title VII antiretaliation provision's broad protection apply to the MWPA and these protections would be hollow if an employer were free to exact retaliation against whistleblowers outside of employment." *Id.* at *60.

In light of the Supreme Court's reasoning in *Burlington Northern*, and the First Circuit's reasoning in *Noviello*, and given the purpose of the comparable Title VII and Maine antiretaliation provisions, the Court concludes that a hostile work

environment may be an actionable adverse employment action. A narrow construction of the MWPA and MHRA would allow an employer to retaliate against an employee in small continuous ways as long as the action did not arise to the level of a discrete retaliatory act. This would render the antiretaliation provision hollow if an employer could legally make a work environment unpleasant in small but potentially meaningful ways over an extended period of time and then use the statute of limitations period as a shield against potentially meritorious employee claims.

Finally, the Law Court has consistently interpreted the MWPA and MHRA with reference to Title VII. *Currie*, 2007 ME 12, ¶ 13, 915 A.2d 400 (noting that the Law Court's "construction of the MHRA and WPA has been guided by federal law" including Title VII, in the absence of Law Court precedent); *see also Gammon*, 762 F. Supp. 2d at 182 ("The MWPA analysis is guided by federal case law construing analogous statutes"); *LePage*, 2006 ME 130, ¶ 19, 909 A.2d 629 (citing the Law Court's adoption of the *McDonnell Douglas* burden shifting analysis as an example of how the Law Court looks to federal caselaw); *Winston v. Me. Technical Coll. Sys.*, 631 A.2d 70, 74-75 (Me. 1993) ("We have stated that because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA"). In particular, the Law Court has articulated that:

> In enacting the Human Rights Act, Maine was legislating against the background of prior federal anti-discrimination statutes and a developing body of case law construing and applying those statutes. Over the years the federal cases have formulated a special methodology for evaluating the evidence introduced in cases of alleged unlawful employment discrimination. As we have previously held, the Maine

> legislature -- by adopting provisions that generally track the federal anti-discrimination statutes -- intended the courts to look to the federal case law to provide significant guidance in the construction of our statute.

*Me. Hum. Rts. Comm'n v. City of Auburn*, 408 A.2d 1253, 1261 (Me. 1979) (internal quotation marks omitted).[10]  In fact, the Law Court has stated that "[t]he special rules developed by the federal courts provide 'a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'"  *Id.* at 1261 (quoting *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 577 (1978)).  In sum, interpreting the MHRA and MWPA as permitting a retaliatory hostile work environment claim is consistent with precedent from the Law Court and this District.  *See Thayer*, 2011 U.S. Dist. LEXIS 74229, at *59-60 ("As such, the same justifications the *Burlington Northern* Court identified for the Title VII antiretaliation provision's broad protection apply to the MWPA and these protections would be hollow if an employer were free to exact retaliation against whistleblowers outside of employment").

In light of these factors, the Court finds it appropriate to treat Mr. Ardito's hostile work environment retaliation claim as cognizable in resolving this motion to dismiss.  To the extent that there is uncertainty as to how the Law Court would interpret this question "the Court will not foreclose a broad category of cases by

---

[10]      In *Moon v. Webber Oil Co.*, No. 7-126-B-W, 2008 U.S. Dist. LEXIS 2287 (D. Me. Jan. 10, 2008), *aff'd* 2008 U.S. Dist. LEXIS 8745 (D. Me. Feb. 5, 2008), this District noted that the Law Court rejected a recommendation that federal precedent be applied to ambiguous statutory language in the MHRA. *Id.* at *5-6.  The *Moon* court stated that "*City of Auburn* and subsequent Maine Law Court cases have merely concluded that the state courts will look to federal precedent in situations where the federal statutory law and state statutory law are analogous." *Id.*  The Court's reliance on *City of Auburn* here is consistent with *Moon*, as the Court is not presented with ambiguous statutory language, but is instead tasked with interpreting a provision of Maine law that runs parallel to federal law.

deciding that [an] employee cannot engage in protected activity and suffer adverse employment action" through a retaliatory hostile work environment. *Id.* at *61.

### b. Application

The Court concludes that Mr. Ardito has plausibly alleged a retaliatory hostile work environment and thus survives dismissal. "Hostile environment claims involve repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment." *Doyle*, 2003 ME 61, ¶ 23, 824 A.2d 48 (citing *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115-16). "In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115-16). Additionally, "[t]he [C]ourt must determine whether the environment was subjectively abusive to the employee, and, in addition, whether that environment was hostile or abusive pursuant to an objective standard." *Blake*, 2005 ME 32, ¶ 9, 868 A.2d 234.

The First Circuit described the hostile work environment inquiry as "distinguish[ing] between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Noviello*, 398 F.3d at 92 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). In other words, "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." *Id.*

A court's analysis of retaliatory harassment is "more nuanced" because "[t]he very act of filing a charge against a coworker will invariably cause tension and result in a less agreeable workplace." *Id.* at 93. As a result, "actions that are hurtful to a complainant only because coworkers do not take [his] side in a work-related dispute may not be considered as contributing to a retaliatory hostile work environment." *Id.* Rather, "[i]t is only those actions, directed at a complainant, that stem from a retaliatory animus which may be factored into the hostile work environment calculus." *Id.* As to the supervisor-supervisee relationship, the Law Court stated:

> The relationship between a supervisor and an employee by its very nature involves a certain amount of tension, and at times, may even generate some hostility. A supervisor must be able to exert authority when interacting with a subordinate. In order to demonstrate a hostile work environment in the case of a supervisor-subordinate, the subordinate must show that the hostility was severe or pervasive, and that it extended beyond the normal tension that exists in many supervisor-supervisee relationships.

*Blake*, 2005 ME 32, ¶ 10, 686 A.2d 234.

Mr. Ardito points to several grievances that he believes created a hostile work environment, including: (1) SSP refusing to hire him for the west coast position and refusing to give him oversight over its new hire in that position, Mr. West; (2) the systematic stripping of Mr. Ardito's customers and his assignment to less significant clients; (3) SSP "gaslighting" Mr. Ardito by either failing to respond to his complaints or denying that he ever made a complaint; (4) SSP's issuance of the demand letter to Mr. Ardito's daughter; and (5) an unfavorable employment review in January of 2021.

One view is that SSP's alleged conduct amounts to nothing more than the type of "petty slights or minor annoyances that often take place at work and that all

employees experience." *Billings v. Town of Grafton*, 515 F.3d 39, 54 (1st Cir. 2008) (quoting *Burlington Northern*, 548 U.S. at 68).   However, "cumulatively these allegations plausibly paint a picture that would allow a factfinder to find [SSP's] conduct sufficient to deter a reasonable person from challenging [SSP's confidentiality and trade secrets] practices had [he] known[he] would be subjected to these abuses if successful." *Rodríguez-Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 285 (1st Cir. 2014) (citing *Burlington Northern*, 548 U.S. at 68).   Ultimately, whether SSP's conduct falls outside of the scope of anti-retaliation laws or whether it constitutes a hostile work environment requires additional development of the record, rendering dismissal inappropriate at this time.

Although the Court construes Mr. Ardito's hostile work environment allegations cumulatively, several specific allegations bear note.   First, Mr. Ardito alleges that he was passed over for the west coast position initially offered to him, he was never given supervisory responsibility over Mr. West, despite SSP's promise to grant him supervising authority, SSP systematically transferred his clients away to Mr. West, he was assigned to less high-profile accounts with little promotional opportunity, and over time, his involvement in the Steering Committee was reduced from 20% to 3% and SSP restricted his access to Steering Committee information. *First Am. Compl.* ¶¶ 36-37, 128-129, 149.   The First Circuit previously stated that a "change in an employee's responsibilities," such as a refusal to promote, divestiture of significant responsibilities, or withholding of recognition, may constitute an adverse employment action. *See Colón-Fontánez v. Mun. of San Juan*, 660 F.3d 17,

37, 42 (1st Cir. 2011); *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 50 (1st Cir. 1999) (concluding that a substantial divestment of responsibilities may constitute an adverse employment action).

Mr. Ardito alleges that his customer base dwindled, SSP transferred nine out of his thirteen clients to Mr. West, and over time, he was assigned less prestigious clients. Accepting these facts as true, Mr. Ardito has alleged a substantial change in his job responsibilities, especially as he set forth the important relationship at SSP between bonus and career advancement opportunities and the extent and prestige of his client base. *First Am. Compl.* ¶¶ 27-29. Similarly, Mr. Ardito states that he was told at various points that he was no longer eligible for promotion and that, by the time he filed his action in state superior court, promotion was entirely "off the table." *See id.* ¶ 153. Considering Mr. Ardito's contention that his client and career aspirations were well documented over the course of his employment with SSP, a jury could reasonably conclude that these changes to his advancement prospects and client base contributed to a hostile work environment that would objectively dissuade an employee from reporting his employer's perceived illegal conduct. This determination requires a holistic, fact-intensive review of the employee's unique situation.

Although the denial of a promotion may arise to the retaliatory level, courts have held that a change in responsibilities is not adverse unless it affects the employee's prior authority. *See Colón-Fontánez*, 660 F.3d at 42 (citing *Simas*, 170 F.3d at 50). This case requires further factual development to understand Mr.

Ardito's position and how it changed, his discussions with SSP regarding promotion, additional facts relating to the alleged transfer of clients, and whether Ms. Tong's conduct went beyond the normal tensions between supervisor and supervisee. However, the Court takes Mr. Ardito's allegation as true for purposes of the motion to dismiss and the allegations on this point are sufficient to preclude dismissal.

Second, Mr. Ardito alleges that upon returning from leave, he was required to choose between going back to his former job with a reduced client base or accepting a different job with an experimental product and responsibilities on the Steering Committee. *First Am. Compl.* ¶ 119.  Based on Mr. Ardito's allegations, it is plausible that giving Mr. Ardito a choice between an experimental product or a reduced client load, SSP effectively forced Mr. Ardito to return to a less prestigious job with diminished responsibilities, which could constitute an adverse employment action. *See Rodríguez-Vives*, 743 F.3d at 286 (comparing *Morales-Vallellanes v. Potter*, 605 F.3d 27, 38 (1st Cir. 2010) (holding on summary judgment that reassignment to duties which were not "more difficult, less prestigious, or objectively inferior" was not an adverse employment action), *with Tart v. Illinois Power Co.*, 366 F.3d 461, 473 (7th Cir. 2004) (jury could have found adverse employment action where plaintiffs were reassigned to "jobs . . . [that] involved far less skill and significantly harsher working conditions than the plaintiffs' prior positions")); *Morales-Vallellanes*, 605 F.3d at 38 ("In appropriate circumstances, disadvantageous work assignments may qualify as materially adverse"); *Billings*, 515 F.3d at 54 ("A jury could find that, as a result of [a] transfer, [the plaintiff] occupied an objectively less prestigious job,

reporting to a lower ranked supervisor, enjoying much less contact with the Board, the Town, and members of the public, and requiring less experience and fewer qualifications"); *Depaolo v. GHM Portland Mar, LLC*, No. 2:16-cv-00468-NT, 2018 U.S. Dist. LEXIS 135286, at *28 (D. Me. Aug. 10, 2018) (concluding on summary judgment that a reasonable factfinder could conclude that an employee was "demoted," and thus subjected to an adverse employment action, where he was told that if he wanted to come back from FMLA leave he could only return in a general maintenance position). *But see Tomasini v. U.S. Postal Serv.*, No. 17-1552 (MEL), 2022 U.S. Dist. LEXIS 53817, at *71 (D.P.R. Mar. 24, 2022) ("[A] *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action" (alteration in *Tomasini*) (emphasis in original) (quoting *Marrero v. Goya of P.R., Inc.* 304 F.3d 7, 23 (1st Cir. 2002)).

Third, Mr. Ardito alleges that his manager issued a negative performance evaluation after receiving praise from Steering Committee members, and after years of positive evaluations, consistently successful sales, and high-performance metrics. *See First Am. Compl.* ¶¶ 139-143. Accepting Mr. Ardito's assertions as true, such "'unwarranted' negative job evaluations may constitute an adverse employment action" and would contribute to a hostile work environment when cumulatively viewed alongside his other allegations. *LaBrecque v. Mabus*, No. 2:14-cv-00357-JAW, 2017 U.S. Dist. LEXIS 21815, at *67 (D. Me. Feb. 16, 2017).

Finally, Mr. Ardito also alleges that SSP limited his travel opportunities, failed to respond to his concerns for several months and subsequently insinuated that he had not made a complaint, praised Mr. West for sharing information while criticizing Mr. Ardito, disclosed personal information to Mr. Ardito's daughter and her employer in the demand letter, and otherwise berated Mr. Ardito and pressured him to engage in illegal conduct.   Accepted as true and viewed cumulatively, these allegations plausibly constitute a hostile working environment in combination with the other allegations discussed above.  *See Rodríguez-Vives*, 743 F.3d at 285 (explaining that restricting an employee's access to professional advancement opportunities could reasonably deter an employee from reporting illegal employer conduct (citing *Burlington Northern*, 548 F.3d at 69)); *Tomasini*, 2022 U.S. Dist. LEXIS 53817 at *68-69 ("Discipline or a reprimand for the purposes of retaliation may constitute an adverse employment action if it was 'undeserved' or 'unfairly' imposed and if it carries 'tangible consequences'" (quoting *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 794 F. Supp. 2d 285, 293 (D. Mass. 2011)).  *But see Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 73 (1st Cir. 2011) ("[A] criticism that carries with it no consequences is not materially adverse and therefore not actionable").

A reasonable person could find that such actions could reasonably interfere with an employee's job and go beyond the normal unpleasantness of a work environment or tension between supervisor and supervisee.  Moreover, it is plausible that an employee would be deterred from reporting perceived illegality if they knew they would be pressured to engage in conduct they perceived as illegal, their personal

information would be disclosed to others without their knowledge and consent, they would be berated and criticized by their supervisors, they would have job responsibilities and promotional opportunities taken away, and as a consequence, experience extreme job-related stress and anxiety. This is ultimately a question of fact that cannot be answered at this stage in the proceedings. *See Thayer*, 2011 U.S. Dist. LEXIS 74229, at *44.

### 3. Causal Link

Finally, Mr. Ardito has sufficiently alleged a causal link. "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." *Wyatt v. City of Bos.*, 35 F.3d 13, 16 (1st Cir. 1994); *see also Taghavidinani v. Riverview Psychiatric Ctr.*, No. 1:16-cv-00208-JDL, 2018 U.S. Dist. LEXIS 35403, at *17 (D. Me. Mar. 5, 2018) (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, 45 A.3d 722, 728 (Me. 2012)).

Here, Mr. Ardito sufficiently alleged a causal link between his various reports to SSP regarding his concerns about the inappropriate disclosures and NDA violations and SSP's alleged retaliatory actions. First, Mr. Ardito alleges that in January 2018, he first informed Ms. Tong and Mr. Sanner of his concerns about misappropriation of confidential information. It was this same month that Mr. West was hired for the west coast position instead of Mr. Ardito. It was also around this same time that SSP allegedly began to strip Mr. Ardito of his customers and reassign him to lower profile clients. It is unclear from the First Amended Complaint whether the alleged retaliatory actions occurred before or after Mr. Ardito reported his

concerns, which is itself sufficient justification for the Court's denial of this pending motion.  However, based on the pleadings, a reasonable person could conclude that these events occurred in close proximity.

Mr. Ardito also made additional reports in the summer of 2018 and in October 2018, and he alleges that around this time he was criticized, his job changed and his client base dwindled.  *First Am. Compl.* ¶¶ 60-61.  Furthermore, it was in March 2020, three weeks after SSP attempted to expedite the MHRC process, that SSP sent a demand letter to Mr. Ardito's daughter and her law firm.  Again, from the First Amended Complaint, Mr. Ardito has alleged the retaliatory conduct occurred in close proximity to his reports.  Finally, Mr. Ardito alleges that it was only after he testified at the MHRC hearing that he received a negative performance review and that the CEO "changed his mind" about Mr. Ardito's involvement in the Steering Committee. For the purposes of dismissal, Mr. Ardito has sufficiently alleged a causal connection.

## VI.    SUMMARY

The Court concludes that Mr. Ardito has plausibly alleged a claim for a retaliatory hostile work environment under the MWPA and MHRA.

## VII.   CONCLUSION

The Court OVERRULES Solvay Specialty Polymers USA, LLC's objections to Mark Ardito's Praecipe (ECF No. 32) and DENIES Solvay Specialty Polymers USA, LLC's motion to dismiss Mark Ardito's First Amended Complaint (ECF No. 25).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of June, 2022